## WHITEHEAD v. COMMISSIONER OF INTERNAL REVENUE.

### No. 5349.

Circuit Court of Appeals, Fourth Circuit.

April 9, 1945.

John F. Greaney, of Washington, D. C., for petitioner.

I. Henry Kutz, Sp. Asst. to Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key, A. F. Prescott, and Robert Koerner, Sp. Assts. to Atty. Gen., on the brief), for respondent.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

This is an appeal by Eleanor Whitehead (hereinafter called petitioner) from a decision of the Tax Court of the United States determining the amount of petitioner's federal income tax for the year 1941.

William Kable, prior to his death in 1920, created a testamentary trust for the benefit of petitioner (his wife) and their three children. In the corpus of this trust were all the outstanding shares of stock in the Staunton Military Academy, Incorporated (hereinafter called the Academy). Petitioner was to receive the net income of the trust for life, except that as each child became 21 years old, one ninth (1/9th) of this net income was to be paid to him or her, thus correspondingly reducing the income from the trust payable to petitioner. Before 1936, petitioner had married again and the three children, William Kable II, Eleanor Kable Miller and Helene Kable Ferguson were all over the age of 21 years. Before the events hereinafter set out, petitioner had been a trustee of this testamentary trust and also a director of the Academy for a number of years.

In 1936, William Kable II became convinced that William Rowland, a testamentary trustee and a director of the Academy, had been faithless to his trust and that a civil action should be instituted against Rowland. Petitioner refused utterly to enter into this suit, advised her son that she would not take any of the proceeds from the suit, if it were decided against Rowland, and tried to dissuade her son from prosecuting this suit. Eleanor Miller, however, agreed to join her brother in this suit but refused to be responsible for any of the costs or expenses of the suit. In January, 1937, suit was duly instituted in the Corporation Court of the City of Staunton, Virginia, by William Kable II and Eleanor Miller against Rowland, which asked for his removal as trustee and sought an accounting.

The attorney for William Kable II suggested that the Academy should become a party to this suit. On June 8, 1937, at a meeting of the board of directors of the

Academy, a formal resolution was adopted authorizing the Academy to intervene in the suit and directing the business manager "to employ counsel and do whatever in his opinion may be necessary to carry out the object and purpose of this resolution." On June 30, 1937, the Academy by formal petition intervened in, and became a party to, the civil action against Rowland.

In August, 1938, the Corporation Court of Staunton entered a decree ordering the removal of Rowland as trustee and requiring him to *account to the Academy* for profits realized by him from his *transactions with the Academy*. On Rowland's appeal, final judgment was entered against him by the Supreme Court of Appeals of Virginia for more than $100,000 *in favor of the Academy*, Rowland v. Kable, 174 Va. 343, 6 S.E.2d 633. In July, 1940, under a compromise settlement, *the Academy* received some $27,350.

At a meeting of the directors of the Academy, the following resolution (petitioner being present and voting in favor of the resolution) was adopted:

"Resolved, that the entire net proceeds of the recovery in favor of this school from William C. Rowland be distributed by W. H. Steele, the Treasurer, as a *special dividend* to the beneficiaries and for distribution and division among them *in accordance with any written agreement which they have made among themselves* and which written agreement is to be deposited with the Treasurer and filed in the records of his office." (Italics ours.)

And, at the same meeting, William Kable II exhibited to the board a written contract (of even date) *signed by himself, his two sisters and his mother* (petitioner), which in part provided:

"Now, therefore, in order to obtain the unanimous consent of *all the undersigned parties* who are the *beneficiaries under the will of William G. Kable,* deceased, and *as such entitled to all the dividends declared by Staunton Military Academy,* do agree as follows:

"That the Board of Directors of Staunton Military Academy *be requested by the undersigned beneficiaries to declare a dividend* equal to 50% of such compromise settlement, after the payment of attorney's fees, the entire amount of which dividend shall be paid to William G. Kable, II; and the undersigned beneficiaries do by these presents direct the said Staunton Military Academy to make payment of said dividend as above directed, and do further waive any and all rights that they might otherwise have in said dividend.

"The residue of said settlement after payment of the amounts hereinbefore described, shall be held by Staunton Military Academy, and at *their request be paid by said Academy to Eleanor Kable Miller, Helene Kable Ferguson and Eleanor E. Whitehead, in such amounts, and upon such terms and conditions, as they may agree upon."* (Italics ours.)

Under date of August 19, 1940, the petitioner sent to the Treasurer of the Academy the following letter:

"I am requesting you to distribute any money collected by you as Treasurer of Staunton Military Academy; and, collectable in accordance with the compromise agreement between Staunton Military Academy and William C. Rowland, as follows:

"After deducting attorney fees and commissions (½) one half of balance to be paid to W. G. Kable II; (¼) one quarter to Helene Kable Ferguson; (¼) one quarter to Eleanor Kable Miller."

This letter was written by petitioner at the request of the Treasurer and President of the Academy. The net proceeds of the suit against Rowland were, accordingly, distributed by the checks of the Academy to William Kable II, Helene Ferguson and Eleanor Miller. Each of these three duly reported, upon his or her federal income tax return, the amount thus received.

Upon this anything but simple set of facts, the Commissioner of Internal Revenue contended that, to the extent of the two-thirds (2/3rds) of the net proceeds of the Rowland litigation and compromise receivable by, and payable to, the petitioner, this was income taxable to the petitioner, on the ground that this income was constructively received by petitioner, was controlled by her express direction and thus constituted an anticipatory assignment of income on her part. The petitioner, on the other hand, strenuously insists that, as to this two-thirds (2/3rds) of the net proceeds from Rowland, she, from start to finish, firmly *abandoned* and fixedly *renounced* all her share in these proceeds, that they were never (actually or constructively) received by, and thus should not be taxed to, the petitioner. The Tax

Court decided this question against the petitioner and we feel constrained to affirm that decision.

Petitioner relies heavily upon the Giannini case (Commissioner of Internal Revenue v. Giannini) 42 B. T. A. 546, affirmed, 9 Cir., 129 F.2d 638. Assuming that the decision in this case is correct, we think the instant case is clearly distinguishable. A very prosperous corporation agreed to pay as salary to Giannini, its president (with a guaranteed minimum), for the year 1927 five per cent (5%) of its net profits. Giannini, learning that he was thus entitled to receive over $440,000 for the first part of that year, notified the directors that he would accept no further compensation for that year and he *suggested* that the corporation do something worth while with the money. Though this was merely a precatory suggestion, in no way binding on the corporation, his suggestion was carried out by the establishment of the Foundation for Agricultural Economics of the University of California. Indeed, Circuit Judge Stephens was careful to point out that there was substantial evidence to support the finding of the Board of Tax Appeals "that the taxpayer did not receive the money, and that *he did not direct its disposition. All that he did was to unqualifiedly refuse* to accept any further compensation for his services with the suggestion that the money be used for some worth while purpose. So far as the taxpayer was concerned, the corporation could have kept the money." (Italics ours.) 129 F.2d at page 641.

Though, in the *instant case, the petitioner at the start* may have intended a *purely negative renunciation* of her share of the Rowland proceeds, her later acts show that she soon went beyond this and that she definitely and unequivocably *directed and controlled* the division of these proceeds *in specific aliquot parts* among her own children. In the agreement of July 17, 1940, signed by her and her three children (all of the beneficiaries under the testamentary trust) the directors of the Academy were requested not only to pay a dividend of fifty per cent (50%) to William Kable II but also to hold the remaining half of these proceeds "and at their request be paid by said Academy to Eleanor Kable Miller, Helene Kable Ferguson *and Eleanor E. Whitehead* (the petitioner) in *such amounts,* and upon such terms and conditions, as *they* (all three—the petitioner and both daughters) may agree upon." (Italics ours.) Again, in a letter written by petitioner on August 19, 1940, at the request of the Treasurer and President of the Academy, she requested that the net Rowland proceeds be *specifically and definitely distributed* as follows: "(½) one half of balance to be paid to W. G. Kable II (her son); (¼) one quarter to Helene Kable Ferguson (her daughter); (¼) one quarter to Eleanor Kable Miller (her daughter)." It can hardly be said that this language in the contract and in the letter is the language of one who has *renounced* and *abandoned all her interest* in these Rowland proceeds. Nor are they, in any fair sense mere precatory expressions.

 Counsel for petitioner further contend that taxation deals with substance not form, with realities rather than with appearances. Helvering v. Tex-Penn Oil Co., 300 U.S. 481, 57 S.Ct. 569, 81 L.Ed. 755; Doyle v. Commissioner of Internal Revenue, 4 Cir., 147 F.2d 769. With this we heartily agree. Then we are told:

"In the instant case, the evidentiary facts show that the Petitioner had signed the agreement of July 17, 1940 and the letter of August 19, 1940, solely because she was advised that it was necessary so to do in order to maintain the position taken by her from the very beginning that she would have no interest in the action against Rowland, nor participate in any recovery."

And again:

"The petitioner did not consider this as income to the school at all; to her mind it was an outside thing and she felt that she had no interest in it and her action in signing agreements was as the result of advice given her that this was necessary to protect the interests of the others."

There is, we think, an obvious answer to these contentions. Taxation, dealing with realities, is concerned more with deeds than with words; its functional approach is, and must necessarily be, objective rather than subjective. Transactions, as to their nature, are judged by their legal attributes and juristic consequences, not by titles affixed thereto by individuals. A bailment is not a sale merely because one or more parties to the relationship calls it a sale or so believes and vice versa.

Whatever petitioner's thoughts may have been, the claim against Rowland was the claim of the Academy corporation. Doubtless that is why the Academy intervened

in the suit instituted against Rowland and why the judgment ran in favor of the Academy. Again, whatever motives may have prompted the petitioner to execute the distribution contract and sign the distribution letter, she thereby stepped completely out of the purely negative role of a mere passive renouncer and became the person who actively directed and definitely controlled the precise disposition, as to both recipients and aliquot portions, of the proceeds realized from the compromise of the judgment claim against Rowland. To paraphrase Emerson, her acts (and their legal consequences) speak so clearly that her inconsistent thoughts and words strike quite vainly upon the judicial ear. It seems clear that the directors of the Academy were unwilling to distribute these proceeds to petitioner's children upon a mere renunciation; as practical business men, they demanded from the petitioner, as a prerequisite to this distribution, and received, far, far more.

A tax on income cannot be avoided by an anticipatory assignment thereof, so petitioner here must be legally regarded as either constructively receiving this income, Harrison v. Schaffner, 312 U.S. 579, 61 S. Ct. 759, 85 L.Ed. 1055, or as realizing it through the enjoyment of an effective transfer thereof to her children. Corliss v. Bowers, 281 U.S. 376, 50 S.Ct. 336, 74 L.Ed. 916; Helvering v. Horst, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75, 131 A.L.R. 655. And, however effective this transfer by the petitioner may have been in controlling the property rights between the petitioner and her three children, it did not thereby serve to avoid petitioner's liability for a tax on the income thus transferred. Hyman v. Nunan, 2 Cir., 143 F.2d 425; Doyle v. Commissioner of Internal Revenue, supra. And quite germane here, we believe, are the words of Mr. Justice Holmes in Lucas v. Earl, 281 U.S. 111, 114-115, 50 S.Ct. 241, 74 L.Ed. 731:

"There is no doubt that the statute could tax salaries to those who earned them and provide that the tax could not be escaped by anticipatory arrangements and contracts however skilfully devised to prevent the salary when paid from vesting even for a second in the man who earned it. That seems to us the import of the statute before us and we think that no distinction can be taken according to the motives leading to the arrangement by which the fruits are attributed to a different tree from that on which they grew."

Had the distribution of the money recovered from Rowland followed the normal course, the sequence of legal steps would have been as follows: (1) The money would have been paid to the Academy since, as we have pointed out, the claim was its property; (2) the Academy would have declared a dividend payable to its sole stockholder, the testamentary trust estate created by the will of the senior Kable; and (3) the Trustees would have been legally bound to distribute the money thus received, according to the terms of the testamentary trust—2/3rds to the mother and 1/3rd to the children. This legal situation could not have been by-passed so as to avoid income taxes. Two-thirds of the fund were necessarily subject to the control of the petitioner and could not be diverted from her without her authority.

In arriving at our conclusion, we are not without sympathy for the petitioner on account of the rather unfortunate predicament in which she now finds herself. We find nothing in the record to indicate either that her conduct was motivated by bad faith or that her actions were prompted by a desire to evade taxes. But we must not permit sympathy to dull our judicial vision; nor, by that same token, are we empowered to wrest once the law to our authority. And all this, we think is none the less true though the record rather clearly lends itself to the inference that the petitioner could hardly be classified as an immature woman, untutored in the principles and practices of the market place.

The decision of the Tax Court of the United States is affirmed.

Affirmed.