Jackson B. **BRAGG** and Susanne Bragg, Petitioners–Appellants,

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

John E. **KAYE** and Caroline Kaye, Petitioners–Appellants,

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

No. 87–3302
Non–Argument Calendar.

United States Court of Appeals,
Eleventh Circuit.

Sept. 30, 1988.

---

J. Doyle Tumbleson, Kinsey Vincent Pyle, P.A., Daytona Beach, Fla., for petitioners-appellants.

Gary R. Allen, Chief of App. Section, David English Carmack, David E. Brunori, U.S. Dept. of Justice, Appellate Section, Tax Div., Washington, D.C., for respondent-appellee.

Before TJOFLAT, HILL and JOHNSON, Circuit Judges:

PER CURIAM:

This is an appeal from the United States Tax Court. The tax court held that there were deficiencies in the income taxes due from the appellants for the taxable years 1980–81. The court found that appellants had received kickbacks which they had not reported as taxable income and that the underpayment of the appellants was due to fraud within the meaning of section 6653(b) of the Internal Revenue Code of 1954. Appellants argue here that the findings made by the tax court are clearly erroneous. We find that the evidence presented was sufficient to support the findings of the tax court.

## I. KICKBACK AND FRAUD ISSUES

Appellants Jackson B. Bragg (Dr. Bragg) and John E. Kaye (Dr. Kaye) are osteopathic physicians and have practiced their professions for a number of years in the Daytona Beach area of Florida. During 1980 and 1981, they were each one-third shareholders in Daytona Beach General Hospital, Inc.; the other one-third of the shares was publicly owned by approximately 350 shareholders. Dr. Bragg was president and director and Dr. Kaye was secretary, treasurer, and director of this hospital.

Francis Monaco (Monaco) was employed at the hospital as director of the clinical laboratory pursuant to a written contract dated September 18, 1978, which was personally negotiated by Dr. Bragg and Dr. Kaye. Initially, Monaco was to receive 35% of the gross monthly proceeds derived from the operation of the clinical laboratory facilities at the hospital. The direct cost of supplies, salaries, payroll taxes, group insurance, repairs, equipment leasing and blood was to be deducted from this 35%. Monaco's percentage was later raised to 40% and then to 42%.

There was compelling evidence that, in addition to the written contract, Dr. Bragg and Dr. Kaye had an oral agreement with Monaco whereby Monaco was to pay them personally each month a minimum of $1,000 per month or 10% of the gross laboratory fees, whichever was greater. Payments made by Monaco were in cash. The cash was divided equally, placed into envelopes, and delivered to the doctors by one of the laboratory employees. The doctors did not give Monaco a receipt for the money. Evidence was presented showing net checks received by Monaco from the hospital during 1980–81 and the amounts deposited, the difference being approximately 10% in each case. The doctors did not report any of Monaco's cash payments as taxable income.

Doctors Bragg and Kaye assert that these payments were in repayment of loans which Monaco received from September 1978 through October 1981. However, Monaco testified that he never received loans from Dr. Bragg and Dr. Kaye. The doctors kept no contemporaneous records of these alleged loans, nor did they receive any notes, receipts or other documentation

from Monaco for any loan. Dr. Bragg testified that he and Dr. Kaye requested Monaco sign a $13,000 promissory note. The promissory note bears a signature but is denied by Monaco to be his. Dr. Bragg failed to identify Monaco's signature positively at trial, and further testified that he did not see Monaco sign the document. In an attempt to support his claim, Dr. Bragg produced his desk type calendar from October 9, 1981 to December 31, 1982, which contained notations "Monaco owes B and K $13,000." However, after examination by a questioned documents expert, nine of these entries were stipulated to not having been made until two years later.

Monaco made his last payment to Drs. Bragg and Kaye in October 1981, when the hospital was leased to Bernie Bachs (Bachs). After Bachs leased the hospital, Monaco continued to operate the chemical laboratory on the same terms as he had when Dr. Bragg and Dr. Kaye ran the hospital, except that he no longer made the monthly cash payments to them. In July 1982, Dr. Bragg and Dr. Kaye had to take the hospital back from Bachs because he was unable to make the lease payments. The doctors rehired Monaco to run the laboratory, but instead of paying him 42% of the laboratory billings, they paid him 35%, and he did not thereafter make the cash payments to the doctors.

On or about January 7, 1983, Monaco contacted Dr. Bragg and informed him that his (Monaco's) income tax returns were being audited with respect to his dealings with the hospital. Monaco testified that in January 1983 the doctors asked him to sign a promissory note in the amount of $72,-000. They offered to raise his percentage of the billings to 60% if he would sign the note. Monaco did not do so.

The audit of appellants' income tax returns for 1980 and 1981 began in July 1983. At his initial interview with the investigating agent, Dr. Bragg stated that he had not received any loan repayments. At Dr. Kaye's interview a few days later, the revenue agent asked him whether he had received any loan repayments, and he stated that both he and Dr. Bragg received loan repayments from Monaco. He stated that there was no written evidence of a loan to Monaco and that it was a gentlemen's agreement.

Approximately two weeks before trial, Dr. Kaye telephoned Mrs. Monaco wanting to know if Monaco had been served a subpoena to testify and suggested to her that it would be better if Monaco refused to testify or became unavailable to testify at appellants' trial.

In 1980 and 1981, Mrs. Bragg created categories on a check register for items including convention expenses, entertainment expenses, dues, business car, business telephone, interest, professional fees, medical, taxes, and personal. The check registers were given to the accountant for use in the preparation of their returns. As a result of Mrs. Bragg's check register classifications, deductions were taken for the entire home telephone expense as "business phone" expense, the family's entire automobile expense as "business car" expense, Mrs. Bragg's airfare to and meals at medical conventions as "convention expenses," and personal expenses for flood elevation of their residence and personal legal expenses as "professional fees."

Dr. and Mrs. Kaye claimed deductions for automobile expenses, wages paid to their maid, their entire telephone and utility expense. In their check register, they characterized their home telephone expenses as "business phone," their home utilities expense as "farm electric," and their family automobile expense as "business gasoline."

From the above recited facts, there was sufficient evidence for the tax court to find that the cash payments made by Monaco to the doctors were kickbacks that were not reported as taxable income and that part of the underpayment of the taxes by the appellants was due to fraud.

## II. MOTION TO VACATE

■ The appellants also argue that the tax court abused its discretion when it denied the appellants' motion to Vacate Decision and Reopen Record for Further Evi-

**166**

dence. Appellants presented evidence that Monaco had plead guilty to a charge of knowingly making false statements in connection with bank loan applications, evidence appellants argue diminishes Monaco's credibility. In denying appellants' motion, the tax court explained that it had not based its opinion entirely on Monaco's testimony. From the evidence recited above, we find that the tax court did not abuse its discretion.

AFFIRMED.