NELSON M. BLOHM AND JOANN M. BLOHM, Petitioners v. COMMISSIONER of Internal Revenue, Respondent
Blohm v. Commissioner
Docket No. 5741-89
United States Tax Court
T.C. Memo 1991-636; 1991 Tax Ct. Memo LEXIS 684; 62 T.C.M. (CCH) 1586; T.C.M. (RIA) 91636; December 23, 1991, Filed *684 Decision will be entered for the respondent. Thomas Troy Zieman, Jr. and Jerome E. Speegle, for the petitioners. Robert W. West, for the respondent. HAMBLEN, Judge. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined a deficiency in Federal income tax of $ 133,749 and an addition to tax under section 6653(b)[1] of $ 119,725 [2] for the taxable year 1981 for Nelson M. Blohm (petitioner) and JoAnn M. Blohm. [3] The issues for decision are: (1) Whether the information on which the statutory notice of deficiency was based was so unreliable and unsupported as to cause the notice to be arbitrary and shift the burden of going forward with the evidence to respondent; (2) whether petitioner had unreported income from kickbacks relating to the purchase of certain oil and gas leases by the Marion Corporation (Marion), of which he was president in 1981, and, if so, in what amount; and (3) whether the doctrine of collateral estoppel applies to prevent petitioner from denying liability as to the addition to tax under section 6653(b), and, if not, whether respondent has proven that petitioner is subject thereto. *685 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners resided in Point Clear, Alabama, at the time the petition was filed in this case. Before 1965, petitioner was the comptroller for Stickelber and Sons, a corporation engaged in the bakery equipment manufacturing business. Stickelber and Sons was named for Merlin A. Stickelber and his sons, David A. Stickelber and Merlin C. Stickelber. Merlin C. Stickelber is hereinafter referred to as Stickelber. In the mid-1960s, Stickelber and Sons was merged into Marion, which was formed to engage in the business of oil exploration. Following the merger, petitioner was comptroller and secretary-treasurer of Marion. At that time the Stickelber family owned 97 percent of Marion. On March 7, 1970, petitioner executed a promissory note with a principal amount of $ 120,250, which was due by November 7, 1971, payable to David A. Stickelber and Stickelber, cotrustees of the Revocable Inter Vivos Trust of Merlin A. Stickelber (the trust). [4] The March 7, 1970, note was in payment for the transfer by the trust of *686 25,000 shares of Marion stock to petitioner. On April 20, 1972, petitioner executed a promissory note with a principal amount of $ 162,500, which was due in 1974, payable to David A. Stickelber and Stickelber, cotrustees of the trust. The April 20, 1972, note was payment for the transfer by the trust of an additional 50,000 shares of Marion stock to petitioner. By October 10, 1973, letter, David A. Stickelber and Stickelber as cotrustees on behalf of the trust amended the liability on the March 7, 1970, and April 20, 1972, notes to be on a nonrecourse basis secured only by the Marion stock with payment due only from the net after-tax proceeds of the sale of the stock. In 1978, petitioner became president of Marion and continued in that position through at least the taxable year 1981. Marion's headquarters was relocated to Daphne, Alabama, in 1980, and Marion engaged in the business of oil and gas exploration, production, *687 sales, contract drilling, refining, coal exporting, and real estate investments. During 1981, Stickelber was chairman of the board of directors and chief executive officer, and Charles Ritchey (Ritchey) was vice president (Oil and Gas Division) of Marion. Ritchey was a geologist and a law school graduate. By 1981, Marion was a publicly held corporation with stock listed on the over-the-counter exchange. During 1981, Marion was designated as a Fortune 500 corporation. Standard and Poor's reported that as of December 31, 1981, Marion had 11,765,000 shares of common stock issued and outstanding. Stickelber owned about 3 percent of the outstanding shares of Marion stock and beneficially controlled about 10 to 12 percent thereof. During 1981, petitioner owned about 1 percent of the Marion stock. Stickelber and petitioner were members of the Marion board of directors, but Ritchey was not. Stickelber and petitioner ran the operations of Marion largely in tandem and communicated on a constant basis about transactions affecting it. Stickelber, Ritchey, and petitioner were members of the Marion exploration committee, whose function was to evaluate drilling prospects either submitted *688 by third parties or in-house. Stickelber and petitioner had two partnerships, in which they invested in several projects jointly. In 1980, Marion stock split two-for-one so that the 25,000 and 50,000 shares which petitioner acquired from the trust became 50,000 and 100,000 shares, respectively. During 1980, petitioner sold 42,000 Marion shares. During 1981, petitioner sold 30,000 Marion shares [5] and reported a gain therefrom of $ 348,191 (a gross sales price less selling expenses of $ 468,441.07 and a basis of $ 120,250). In 1981, Marion Coal Company (Marion Coal) was organized as a Cayman Islands S.A. subsidiary of Marion for the purpose of exporting coal from Alabama to Europe or Asia. Marion Coal was operated by Ronald L. Standridge, its president, and Scott Armstrong, its secretary, treasurer, and vice president. During *689 1983, Marion underwent a reorganization under Chapter 11 of the Bankruptcy Code, 11 U.S.C. secs. 1101-1174 (1988). On their amended Federal income tax return for the taxable year 1983, which was filed in December 1985, petitioners reported "forgiveness of indebtedness" income totaling $ 282,750 from the trust. 1. Cayman Islands Kickback
During 1981, Jon J. Nelson (Nelson) and Henry J. Prevost (Prevost) were independent oil and gas operators and landsmen operating mostly in Texas. An oil and gas landsman obtains oil and gas leases from various land owners and leasehold owners in an area with production potential and sells the leases to an oil exploration company. During 1981, Jerry W. Wooten (Wooten) was an oil and gas geologist working principally in Texas. In this capacity, he analyzed seismic and other data from a geographic area to determine the potential for oil and gas production. In early 1981, Nelson, Prevost, and Wooten (the Texas Group collectively) approached Ritchey with a proposal for Marion to buy a group of leases known as the Jourdanton Prospect. As part of the proposal, at least one-half of the purchase price was to be paid in the Cayman Islands through *690 Marion Coal, which portion of the price the Texas Group would share with representatives of Marion. Ritchey brought the proposal to Stickelber and he agreed to it. On the same day, Stickelber discussed the proposal with petitioner and he agreed to it. Marion agreed to purchase the Jourdanton Prospect from the Texas Group for $ 2,578,825. On February 10, 1981, Nelson executed a contract to sell one-half of his interest in the Jourdanton Prospect to Marion Coal for $ 1,289,412.50. [6] The contract of sale was signed by Ronald L. Standridge as president of Marion Coal and Nelson. By check dated February 13, 1981, which was signed by Stickelber and Scott Armstrong, Marion paid Nelson $ 1,289,412.50 for its one-half of his interest in the Jourdanton Prospect. On February 17, 1981, Stickelber, Ritchey, and the Texas Group flew to the Cayman Islands and met with attorneys *691 at W.S. Walker & Company, Barristers & Solicitors (Walker), George Town, Grand Cayman, Cayman Islands. It was anticipated that the amount of the purchase price to be paid the Texas Group in the Cayman Islands would have been wire transferred so that the distribution could have been completed within 1 day. However, the amount had not been transferred by February 17, 1981. As a result, Stickelber made several telephone calls to ensure that the amount would be wire transferred by the next day, February 18, 1981. On February 18, 1981, the attorneys at Walker established three corporations -- San Pedro Finance Company (San Pedro), St. Lucy Investment Co., Ltd. (St. Lucy), and Linfield Investment, Ltd. (Linfield). San Pedro was owned by the members of the Texas Group, Stickelber, Ritchey, and petitioner. St. Lucy was owned one-third each by Stickelber, Ritchey, and petitioner, and Linfield was owned by the Texas Group. On February 18, 1981, a wire transfer from Marion was received by The Bank of Nova Scotia, Cayman Islands, for the account of Marion Coal in the amount of $ 1,289,412.50. On February 19, 1981, the $ 1,289,412.50 was transferred by intrabank advice from the Marion *692 Coal account to the San Pedro account. On February 19, 1981, the following amounts were transferred by intrabank advice from the account of San Pedro to the accounts of St. Lucy and Linfield, respectively: 1. From San Pedro to St. Lucy
$ 429,374.36
2. From San Pedro to Linfield
860,038.14
Total
$ 1,289,412.50
The $ 429,374.26 payment transferred to St. Lucy is sometimes referred to herein as the Cayman Islands Kickback. On February 18, 1981, the Texas Group and Stickelber and Ritchey left the Cayman Islands. During 1981, petitioner did not travel to the Cayman Islands. The purchase of the Jourdanton Prospect was the single largest purchase made by Marion at that time. Each of the members of the Texas Group, Stickelber, Ritchey, and petitioner as the beneficial owners (shareholders) of San Pedro signed an indemnity agreement in favor of Cayman Corporate Services Ltd. as agent for San Pedro. Stickelber, Ritchey, and petitioner as the beneficial owners (shareholders) of St. Lucy each signed an indemnity agreement in favor of Cayman Corporate Services Ltd. as agent for St. Lucy. The funds in the St. Lucy account were invested in a series of short-term (62 days or less) *693 certificates of deposit in The Bank of Nova Scotia, Cayman Islands, and remained there for about one year. Disbursements from the account of St. Lucy at The Bank of Nova Scotia were as follows: Withdrawals to Pay
Loans to Stickelber/
Disbursements
Disbursements
Date
Ritchey
to Stickelber
to Ritchey
8/21/81
$ 30,286.02
$ $ 1/7/82
37,049.61
4/7/82
292,590.18
146,295.07
$ 67,335.63
$ 292,590.18
$ 146,295.07
There were no known bank documents evidencing disbursements from the accounts of San Pedro, St. Lucy, or Linfield to petitioner. Petitioners did not report any portion of the Cayman Islands Kickback on their tax return for the taxable year 1981. In 1982 or 1983, Stickelber canceled petitioner's debt to the trust in consideration for Stickelber's taking petitioner's share of the St. Lucy account. Stickelber did not pay any of the amount to the trust. Affidavits dated November 10, 1982, to dissolve St. Lucy were signed by Stickelber and petitioner as the two remaining beneficial owners of St. Lucy and notarized by petitioner's secretary, Ms. Dorothy Franco. The affidavits are each one page containing two paragraphs, and there are no corporate titles *694 under the signature lines. 2. Kitchen Table Kickback
Subsequently, during 1981, the Texas Group approached Ritchey about purchasing another group of leases known as the Stuart City Prospect. The Texas Group proposed that, if the original sales price was accepted, some amount would be paid to representatives of Marion. Ritchey explained the proposal to Stickelber and petitioner, who both agreed to it. Ritchey flew to Seguin, Texas, and after several hours, received an amount of cash in an elongated box. The cash was in denominations ranging from $ 20 to $ 100, primarily $ 20 bills. Ritchey returned to Mobile, Alabama, with the cash and took it to petitioner's home to be divided. The money was divided equally among Stickelber, Ritchey, and petitioner in petitioner's kitchen. The payment is sometimes referred to herein as the Kitchen Table Kickback. Petitioners did not report any portion of the Kitchen Table Kickback on their tax return for the taxable year 1981. 3. Collateral Estoppel
On September 11, 1986, Ritchey was granted immunity from prosecution for tax crimes and other offenses relating to his 1980, 1981, and 1982 tax returns. Pursuant to the plea agreement *695 between the Government and Ritchey, he agreed in part to provide evidence of tax fraud on the part of petitioner. The plea agreement stated further that he could be prosecuted for perjury if he gave false testimony in the course of providing such evidence. On April 1, 1988, the Grand Jury for the U.S. District Court for the Southern District of Alabama returned an indictment against petitioner, Count Two of which was for violation of section 7201, evasion of Federal income tax, for the taxable year 1981. On July 7, 1988, petitioner, who was represented by counsel, pled guilty to Count Two of the indictment pursuant to a plea agreement but denied guilt. [7] Petitioner did not agree to an amount of tax liability in connection with the plea agreement. On August 30, 1988, a judgment reflecting petitioner's plea was entered by the District Court in United States v. Nelson M. Blohm, Criminal Action No. 88-00048-BH.
*696 In April 1988, a criminal information was filed against Stickelber by the U.S. Attorney for the Southern District of Alabama, and he entered into a plea agreement relating thereto. On September 7, 1990, petitioner filed a Motion to Vacate, Set Aside, or Correct Sentence, or, in the Alternative, to Quash the Indictment, or In the Alternative, for New Trial with the District Court. Petitioner alleged prosecutorial misconduct causing a violation of his constitutional rights in that the indictment was based solely on the affidavit of Ritchey, which was allegedly known to be false and coerced by the Government in reckless disregard for its accuracy and trustworthiness, and that petitioner's guilty plea was coerced by the Government's making a false offer of proof at the plea hearing. On March 26, 1991, the District Court denied the motion to vacate, concluding that there were no violations of petitioner's constitutional rights, that petitioner's guilty plea was made voluntarily on the advice of counsel, and that the discrepancies between Ritchey's affidavit and other records were "minor and immaterial" and "wholly insufficient to challenge [petitioner's] guilty plea." Additionally, *697 the District Court emphasized that the plea agreement with Ritchey provided that he could be prosecuted for perjury if he gave false testimony in the course of providing the Government with evidence of tax fraud on the part of petitioner. The court stated that: "A plea agreement requiring a defendant to provide information is not coercion and Petitioner fails to present support for his allegations that the evidence was not trustworthy." Finally, the court concluded that petitioner failed to present support for the contention that false evidence was presented or used by the Government. On April 25, 1991, petitioner filed a Motion for Reconsideration of the District Court's order, which was denied on May 13, 1991. On May 16, 1991, petitioner filed a Notice of Appeal of the District Court's orders dated March 26 and May 13, 1991. 4. Notice of Deficiency
On December 23, 1988, a notice of deficiency was sent to petitioners, which determined that they had unreported income totaling $ 269,035 relating to Marion's acquisition of oil and gas leases from Nelson ($ 143,268 relating to the Cayman Islands Kickback and $ 125,767 relating to the Kitchen Table Kickback), and that the *698 underpayment of income tax was due to fraud. The determination was based on the guilty plea of petitioner in the criminal case, an affidavit of Ritchey signed on February 3, 1987, and a letter from Stickelber. 5. Post Trial Proceedings
On September 11, 1990, petitioners filed a Motion to Strike Testimony of Ritchey and a Motion to Supplement Record. On December 17, 1990, respondent filed a Motion for Relief from Binding Effect of Stipulation of Facts. By order entered on July 8, 1991, petitioners' Motion to Strike Testimony was denied, petitioners' Motion to Supplement Record was granted, and respondent's Motion for Relief from Binding Effect of Stipulation of Facts was denied as premature. OPINION A. Preliminary Matters
At trial and by motion filed on December 17, 1990, respondent moved to be relieved from the binding effect of Stipulation of Facts Nos. 20, 22, 23, and 24 pursuant to Rule 91(e) because the evidence in the record did not support these stipulations. Specifically, these stipulate that the $ 1,289,412.50 was transferred to the account of Marion Coal in the Cayman Islands and, thereafter, into the accounts of San Pedro, and in turn divided and transferred *699 into the accounts of St. Lucy and Linfield, on February 19, 1981, and not February 18, 1981. Petitioners contend that the notice of deficiency was based upon allegedly perjured statements in Ritchey's affidavit to the effect that the $ 1,289,412.50 was transferred on February 18, 1981, and divided by a distribution of checks while Stickelber and Ritchey were present in the Cayman Islands. They argue that the stipulations that February 19, 1981, was the correct date confirm "the capricious use of false evidence" by respondent inasmuch as Stickelber and Ritchey were not present in the Cayman Islands on that date so that the check distribution could not have occurred. [8]
Respondent asserts that testimony of Stickelber and Ritchey at trial and a notation on a copy of a debit advice on the account of Marion Coal with The Bank of Nova Scotia, which was part of a stipulated joint exhibit, indicate that the $ 1,289,412.50 *700 was transferred on February 18, 1981. Petitioners contend that the bank records, which were stipulated joint exhibits, support the Stipulation of Facts Nos. 20, 22, 23, and 24 to the effect that the appropriate date was February 19, 1981. We agree with respondent to the extent that the only clear evidence in the record indicates that the $ 1,289,412.50 was transferred from Marion to the account of Marion Coal on February 18, 1981, in contradiction of Stipulation of Facts No. 22. We are not bound by a stipulation of facts which is contrary to the evidence in the record. Kirchner, Moore & Co. v. Commissioner, 54 T.C. 940 (1970), affd. 448 F.2d 1281 (10th Cir. 1971); Seatree v. Commissioner, 25 B.T.A. 396 (1932), affd. 72 F.2d 67 (D.C. Cir. 1934). The testimony of Stickelber and Ritchey was to the effect that the $ 1,289,412.50 was wire transferred and received in the Cayman Islands on February 18, 1981. There is no credit advice bank record reflecting the transfer from Marion into the Marion Coal account with The Bank of Nova Scotia in the record. The February 18, 1981, date appears under the "particulars" *701 section on the copy of the debit advice to the Marion Coal account for the transfer to the San Pedro account, which was a stipulated joint exhibit in the record, although the debit advice is dated February 19, 1981. Thus, we view the evidence in the record as contrary to Stipulation of Facts No. 22 and will not be bound thereby. However, we do not consider the evidence in the record to be clearly contrary to Stipulation of Facts Nos. 20, 23, and 24. Stickelber and Ritchey would not necessarily know the date when the intrabank transfers from the Marion Coal account into the San Pedro account, and, in turn, into the St. Lucy and Linfield accounts occurred. The copies of debit and credit advice bank records, which are in the record as stipulated joint exhibits, are dated February 19, 1981, although the record does not establish that this is the effective date of these transfers. Thus, we have followed these stipulation of facts in our findings of fact to the effect that these transfers occurred on February 19, 1981. Petitioner contends that Seatree v. Commissioner, supra, involved a stipulation of a legal conclusion conceded to be erroneous by the taxpayer, *702 and petitioner asserts that it is thus distinguishable from this case. However, the issue in Seatree was whether there was an assignment of income by the taxpayer taxable to him or an assignment of a contract right to future retirement payments not due on the date of the transfer. The stipulation in Seatree was that the assignment of the contract right was executed and delivered to the trust company on June 29, 1922, whereas the facts in the record established that the delivery occurred on August 3, 1922. The taxpayer did not explicitly concede error in the stipulation. Neither the facts nor the conclusion of Seatree restrict its authority to the situation of a taxpayer's concession of error in a stipulation. B. The Substantive Issues
1. The Deficiency Determination
Petitioners assert that the statutory notice of deficiency is arbitrary and erroneous and thus not entitled to a presumption of correctness. Respondent contends that petitioners' assertion is untimely, and in any event, that the deficiency notice was not arbitrary. We agree with respondent that the deficiency notice was not arbitrary. In general, the taxpayer bears the burden of proving *703 that the Commissioner's determination of a deficiency is wrong. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 78 L. Ed. 212, 54 S. Ct. 8 (1933). The courts will not ordinarily look behind a deficiency notice to examine the evidence used or the propriety of the Commissioner's motives or of administrative policy or procedure involved in making the determination. Crowther v. Commissioner, 269 F.2d 292, 293 (9th Cir. 1959), affg. on this issue 28 T.C. 1293, 1301 (1957); Human Engineering Institute v. Commissioner, 61 T.C. 61, 66 (1973). A narrow exception to the general rule exists where the determination relates to unreported illegal income. See Jackson v. Commissioner, 73 T.C. 394 (1979). Under the exception, respondent has the burden of coming forward with substantive evidence linking the taxpayer to the illegal activity in order to preserve the presumption of correctness of the deficiency notice. Jackson v. Commissioner, 73 T.C. at 401. Here respondent introduced admissible, substantive evidence linking petitioner to a one-third share in the Cayman Islands and Kitchen Table Kickbacks. *704 Stickelber testified that he presented the proposal from the Texas Group relating to the Cayman Islands Kickback to petitioner, who agreed to it, and that petitioner was a one-third owner of St. Lucy. Ritchey testified that the terms of the Cayman Islands Kickback proposal were discussed with petitioner, including that he would have a one-third share of the kickback. Additionally, an affidavit to dissolve St. Lucy signed by petitioner as one of the two beneficial owners thereof and notarized by petitioner's secretary was introduced by respondent as evidence. Finally, respondent introduced two indemnity agreements signed by petitioner as a beneficial owner of San Pedro and St. Lucy, respectively, in favor of Cayman Corporate Services Ltd. as agent for both. Regarding the Kitchen Table Kickback, Stickelber testified that Ritchey presented the proposal to Stickelber and petitioner at the same time, and both agreed to it. Both Stickelber and Ritchey testified that the Kitchen Table Kickback was divided equally among Stickelber, Ritchey, and petitioner. We find Stickelber's account of the Cayman Islands and Kitchen Table Kickbacks to be the most logical and convincing presented. *705 We conclude that respondent has met his burden of introducing substantive evidence linking petitioner to both kickbacks, upon which the deficiency determination is based. Consequently, the presumption of correctness attaches to the entire amount determined in the deficiency notice. Petitioners contend that they have shown that the primary evidence behind the deficiency notice was the Ritchey affidavit, which was allegedly false and so known by respondent, and infer from this that under the Jackson rule, the burden of going forward shifts to respondent. According to petitioners, respondent knew the following statements in the affidavit were false: (1) The $ 1,289,412.50 amount was transferred to the Cayman Islands on February 18, 1981, when Stickelber, Ritchey, and the Texas Group were there; (2) the amount was disbursed in six separate checks by an attorney in the Walker offices; (3) Stickelber kept petitioner's share because of a debt that petitioner owed him. Petitioners attempt to support the contention that respondent knew these statements were false with certain stipulations of facts and stipulated joint exhibits, bank records, which contradict the statements. The Stipulation *706 of Facts Nos. 20, 22, 23, and 24 appear to indicate that the transfers occurred on February 19, 1981, and were by means of intrabank transfers from the Marion Coal account to the San Pedro account, and in turn, to the St. Lucy account. [9] Stipulation of Facts No. 28 indicates that petitioner's debt was to the trust. We disagree with petitioners' contention for several reasons. First, the Ritchey affidavit was not the only evidence behind the deficiency determination; the revenue agent relied on a letter from Stickelber linking petitioner to both kickbacks and petitioner's guilty plea. Second, we agree with the characterization by the District Court of *707 the discrepancies between the statements in the Ritchey affidavit and the other evidence (on which the stipulation of facts is based) as "minor and immaterial" in the March 26, 1991, order denying petitioner's motion to vacate his guilty plea in United States v. Nelson M. Blohm, Criminal Action No. 88-00048-BH. Moreover, the discrepancies may be the result of faulty memory because of the time elapsed between 1981 when the kickbacks occurred and 1987 when the affidavit was given. Third, the arguably minor inaccuracies of the Ritchey affidavit are not sufficient under Jackson v. Commissioner, supra, to shift the burden of going forward to respondent where other substantive evidence was introduced at trial clearly linking petitioner to the kickbacks. Petitioners suggest also that the burden of going forward should be shifted to respondent because allegedly the Government's plea agreement with Ritchey for purposes of the criminal case forced him to provide evidence with "reckless disregard for its accuracy and trustworthiness." As noted by the District Court in its March 26, 1991, order denying petitioner's motion to vacate his guilty plea, the inaccuracies *708 were minor and the plea agreement with Ritchey stated that he could be prosecuted for perjury if he gave false testimony in the course of providing the Government with evidence of tax fraud on the part of petitioner. The District Court concluded that "A plea agreement requiring a defendant to provide information is not coercion and petitioner fails to present support for his allegations that the evidence was not trustworthy." We hold no esteem for Ritchey, who appears to be the instigator of this insidious, nefarious, and reprehensible scheme as far as the Marion group was concerned, and we consider it anomalous that Ritchey might bear less a brunt or taint than the others of the consequences of this evil plot. Nevertheless, while we do not find Ritchey to be an ideal witness, we find his testimony plausible in context with the testimony of Stickelber and all of the circumstances extant. We agree with the District Court's conclusion and reject petitioners' suggestion. 2. Kickbacks
Cayman Islands Kickback
Petitioner contends that he did not know about and had no check-writing authority or other rights establishing constructive receipt of the St. Lucy account, never *709 received any cash from the Cayman Islands Kickback, and did not have forgiveness of indebtedness income in 1981. [10] Respondent asserts that petitioner received directly or constructively a one-third share of the Cayman Islands Kickback because Stickelber, Ritchey, and petitioner planned the kickback scheme and had the funds directed into St. Lucy, a Cayman Islands "shelf" corporation of which each was a one-third owner, and each had the right to withdraw his share of the funds as the St. Lucy certificates of deposit matured. We agree with respondent that petitioner was entitled to one-third of the Cayman Islands Kickback, which he directed be paid to the St. Lucy account. Gross income is defined by section 61 to *710 include "all income from whatever source derived." Kickbacks are considered to be taxable income. See, e.g., United States v. Wyss, 239 F.2d 658 (7th Cir. 1957); see also Bragg v. Commissioner, 856 F.2d 163 (11th Cir. 1988). Where a taxpayer is entitled to an amount of income, but directs that it be paid to a third party, the tax treatment is the same as if he received it. Whitehead v. Commissioner, 148 F.2d 718 (4th Cir. 1945); Fouche v. Commissioner, 6 T.C. 462 (1946). [11] In Whitehead, the taxpayer was a beneficiary of two-thirds of the income from a testamentary trust established by her late husband, the corpus of which was all of the outstanding stock in a corporation operating a military school. Her children were the beneficiaries of the other one-third of the trust income. She sent a letter to the corporation's treasurer requesting that a distribution of corporate funds from settlement of a lawsuit be made directly to her children. The court concluded that two-thirds of the funds distributed were taxable to the taxpayer as she had not passively abandoned the funds, but directed to whom *711 they should go. Similarly, compensation for services is taxed to the earner, even though he has assigned the right to receive it to another party. Reichert v. Commissioner, 19 T.C. 1027 (1953), affd. 214 F.2d 19 (7th Cir. 1954). In Reichert, the taxpayer, mayor and county Republican central committee chairman, proposed his friend, Bartlett, for appointment as manager of the county branch of the Motor Vehicle License Bureau (the bureau). The appointment was automatic after the proposal by the mayor. Bartlett agreed that in return for the appointment he would share part of his salary with the taxpayer. They agreed that Bartlett would put the taxpayer's daughter on the *712 payroll of the bureau. She did not work regular hours or every day, did little work, and was paid about twice as much as other employees at her level and more than the head of her office. Bartlett brought the daughter's checks to the daughter in some instances and the taxpayer at other times. This Court concluded that the taxpayer provided the service for which most of the payments were made (i.e., proposing Bartlett for his manager's position at the bureau) and was taxable on the income, even if payments were made to his daughter. Petitioner, Stickelber, and Ritchey earned the Cayman Islands Kickback by arranging Marion's purchase of the Jourdanton Prospect. Petitioner, Stickelber, and Ritchey directed that the Cayman Islands Kickback be paid to St. Lucy, their wholly owned corporation, which they formed the day before for the sole purpose of receiving the kickback. Thus, petitioner is taxable on his one-third share of the kickback. The above scenario is supported by the credible testimony and other evidence in the record. Stickelber testified that he brought the Cayman Islands Kickback proposal to petitioner, who agreed to it and that petitioner was the owner of one-third *713 of the Cayman Islands Kickback in St. Lucy. Ritchey testified that the terms of the proposal were discussed with petitioner, including that he would have a one-third share of the Cayman Islands Kickback. Petitioner signed an affidavit, which was notarized by his secretary, to dissolve St. Lucy as one of two beneficial owners thereof. Also, petitioner as a beneficial owner signed two indemnity agreements in favor of Cayman Corporate Services Ltd. as agent for San Pedro and St. Lucy, respectively. Stickelber testified that he presented the indemnity agreements to petitioner for signature and that petitioner returned them signed; Stickelber identified petitioner's signature on the agreements. This direct testimony and evidence is also supported by circumstantial evidence. The purchase of the Jourdanton Prospect was the single largest purchase made by Marion at that time, and as president of Marion and a director, petitioner almost certainly would have been thoroughly familiar with the transaction, including the payment through Marion Coal in the Cayman Islands and Marion Coal's taking title to a one-half interest in the Jourdanton Prospect. Stickelber's explanation that he kept *714 petitioner's share of the Cayman Islands Kickback to satisfy in part the $ 282,750 debt due the trust is similarly credible inasmuch as the debt was to be paid from the after-tax proceeds of petitioner's sale of Marion stock, and petitioners reported sales of that stock at a gain of $ 348,191 on their 1981 return, and made other sales in 1980. Petitioner testified that there was no agreement between Stickelber, Ritchey, and himself to split the Cayman Islands Kickback, and that he was never a shareholder of San Pedro or St. Lucy. He testified that he believed it was his signature on the affidavit, but was not sure; and if it was, he did not read it before signing it because over a weekly period he signed dozens of documents, which were notarized. Ms. Franco testified that petitioner called her into his office to notarize documents. Additionally, he testified that he did not sign the indemnity agreements. We do not find petitioner's explanation that he did not read the two-paragraph, one-page affidavit credible, especially when the signature line was in his individual capacity, not as president of Marion, and notarized. Similarly, we find implausible his testimony that he did *715 not agree to split the Cayman Islands Kickback, was never a shareholder of San Pedro or St. Lucy, and did not sign the indemnity agreements. Petitioner's overall credibility is damaged by his incredibly implausible and somewhat evasive explanation of the Kitchen Table Kickback circumstances described below. Furthermore, the signatures on the indemnity agreements appear identical to petitioner's signature on petitioners' 1981 and 1983 tax returns as well as the signature on the affidavit notarized by his secretary, and petitioner did not introduce any expert evidence to the contrary. Finally, petitioner's testimony is negated by that of Stickelber and the circumstantial evidence in the record described above. We found Stickelber's testimony concerning petitioner's involvement in the Cayman Islands Kickback to be logical, convincing, and credible. On balance, the evidence indicates that Stickelber, Ritchey, and petitioner were in pari delicto regarding the Cayman Islands Kickback, even if petitioner was not actually present in the Cayman Islands on February 17 or 18, 1981, and did not actually receive any of the cash. Thus, we conclude that petitioner was entitled to one-third *716 of the Cayman Islands Kickback, which he directed be paid to St. Lucy in 1981, and is taxable thereon. Petitioner contends that he never had constructive receipt of the one-third share of the Cayman Islands Kickback because "there is no evidence that [he] had check writing authority or any other authority over the account of St. Lucy." However, our conclusion above regarding constructive receipt based on petitioner's entitlement to one-third of the Cayman Islands Kickback and directing its payment with Stickelber and Ritchey to St. Lucy eliminates any added requirement that he continue to have control after the payment to St. Lucy. See Whitehead v. Commissioner, supra; Reichert v. Commissioner, supra.[12] We reject petitioner's contention and the cases cited in support thereof as inapposite to the Cayman Islands Kickback situation where he directed the third parties' payment on his behalf to St. Lucy. The cases cited by petitioner, [13] which consider the taxpayer's check-writing authority involve the issue of whether the majority-shareholder corporate employee has constructive receipt where his closely held corporation on the accrual *717 method authorizes and deducts the amount of a bonus or compensation at the end of one taxable year, but pays it in a subsequent year. We have considered and agree with petitioner's assertions that there were no checks distributed in the Cayman Islands to Stickelber or Ritchey on February 18, 1981, and that the debt to the trust was not canceled in 1981. However, these assertions have no effect on our conclusion that petitioner is taxable on one-third of the Cayman Islands Kickback because he was entitled to it and directed that it be paid into the St. Lucy account. Kitchen Table Kickback
Petitioner contends *718 that only his version of the Kitchen Table Kickback is credible, and that he allegedly refused to accept the money and should not be taxed on it. Respondent asserts that petitioner agreed to and received one-third of the Kitchen Table Kickback, and never returned it, as supported by Stickelber's and Ritchey's testimony, other circumstantial evidence, and even to some extent, petitioner's own testimony. We agree with respondent. Section 61 defines gross income to include "all income from whatever source derived." The courts have held that kickbacks are taxable income. See, e.g., United States v. Wyss, 239 F.2d 658 (7th Cir. 1957); see also Bragg v. Commissioner, 856 F.2d 163 (11th Cir. 1988). Stickelber testified that Ritchey presented the Kitchen Table Kickback proposal to both Stickelber and petitioner at the same time, and both agreed to it, Ritchey went to Texas and received the cash in an elongated box, and the three divided the kickback at petitioner's house. Ritchey testified that: (1) a "deal was struck" with Nelson and Prevost that Marion would buy the Stuart City Prospect at their asking price and they would "relinquish" $ 377,000 *719 to Stickelber, petitioner, and him; (2) he flew to Texas and received the cash in an elongated box; and (3) the cash was divided by the three at petitioner's house. Additionally, Ritchey testified that petitioner never returned petitioner's share of the Kitchen Table Kickback to Ritchey. The sellers of the Stuart City Prospect were the same three individuals involved in the Cayman Islands Kickback, the transaction occurred at most several months thereafter, and petitioner was still president and a director of Marion. Petitioner admitted that Ritchey and Stickelber came to his home on the evening of the Kitchen Table Kickback, that Ritchey said something about a Texas Santa Clause when he was bringing the money into the house, and that he found a sack of money the next morning on the kitchen counter. However, he testified that there was only a few thousand dollars in the sack, he put it in his car trunk, and in several days to a week, he returned it to Ritchey in the Marion garage. His explanation for not knowing more about what happened that evening was that "there was a lot of drinking of alcohol." We find Stickelber's version of the Kitchen Table Kickback to be convincing *720 and supported in large part by Ritchey's testimony and the circumstantial evidence. We find petitioner's version of the Kitchen Table Kickback to be evasive, implausible, and incredible. Thus, we conclude that petitioner received and is taxable on his one-third share of the Kitchen Table Kickback. Petitioner bears the burden of coming forward with evidence that the determination of the amount of his share of the Kitchen Table Kickback is incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 78 L. Ed. 212, 54 S. Ct. 8 (1933). Petitioner testified that there were a few thousand dollars in the sack. However, we find his version of this to be incredible, including the aspect where he supposedly put the few thousand in his car trunk for several days to a week. Petitioner did not introduce any other evidence regarding the amount of the Kitchen Table Kickback. Stickelber testified that it was $ 300,000 plus in total, and Ritchey testified that it was $ 377,000. They both testified that the cash was in denominations ranging from $ 20 bills to $ 100 bills, and that the total was divided equally among the three. On cross-examination, Stickelber acknowledged that in his letter to the Internal *721 Revenue Service he indicated that the amount of his share of the Kitchen Table Kickback was at least $ 75,000, and that in a deposition taken in a civil lawsuit by Marion against the Texas Group, Stickelber, Ritchey, and petitioner, he testified that the total was $ 210,000 and his share was $ 70,000. On this record, we conclude that petitioner has failed to show that the determination in the notice of deficiency of his share of the Kitchen Table Kickback of $ 125,767 was incorrect. Petitioner attacks the credibility of Stickelber and Ritchey asserting alleged inconsistencies in their testimony regarding when and how the money was transferred relating to the Cayman Islands Kickback, the circumstances of the canceled debt to the trust, the various dollar amounts testified to by Stickelber relating to the Kitchen Table Kickback, and who initiated the kickback schemes. Additionally, petitioner attacks their credibility contending that they each "were testifying as a result of a sweetheart deal with the United States Attorney's Office." Finally, he attacks Ritchey's credibility based on alleged statements made by him to an internal revenue agent shortly before testifying to the effect *722 that his memory would be bad when he testified, and Stickelber's credibility based on his "admission of tax fraud" and alleged "stealing proceeds of his deceased father's Trust from his brother and his deceased sister's heirs." Although we question some of the testimony of Stickelber, we believe that his testimony is credible concerning petitioner's involvement in the Kitchen Table Kickback, as corroborated substantially by Ritchey. Similarly, we question some of Ritchey's testimony. However, we believe that petitioner did not return any of his one-third share of the Kitchen Table Kickback to Ritchey. We find petitioner's testimony in this regard to be totally unbelievable, except to the extent that it is consistent with Stickelber's and Ritchey's testimony (i.e., that the Kitchen Table Kickback was divided at his home). Thus, petitioner's attacks and assertions do not convince us that Stickelber's and Ritchey's testimony was incredible or implausible regarding petitioner's basic one-third involvement in the Kitchen Table Kickback, especially when compared with petitioner's testimony. Additionally, petitioner contends that his alleged return of the sack of money was an effective *723 refusal of it, which should make it not taxable to him. We disagree with petitioner's contention for two reasons. First, we do not find petitioner's version of the Kitchen Table Kickback credible or plausible, including that he put a few thousand dollars in the trunk of his car for several days to 1 week and then returned it to Ritchey. Second, even if we accepted petitioner's testimony, the contention and cases cited in support thereof are inapplicable to his version of the facts. Under his version, he kept some amount of the Kitchen Table Kickback for several days to 1 week, which is not akin to the situation in the cases cited where a taxpayer renounces his compensation from a corporation before receiving it or does not take his trustee's commission from a trust (see Commissioner v. Giannini, 129 F.2d 638 (9th Cir. 1942); Commissioner v. Mott, 85 F.2d 315 (6th Cir. 1936)). 3. Collateral Estoppel/Fraud
Respondent contends that the doctrine of collateral estoppel applies to the August 30, 1988, judgment reflecting petitioner's guilty plea to violating section 7201, and thus, petitioner is liable for the addition to tax under section *724 6653(b). Petitioner asserts that collateral estoppel should not apply because there was prosecutorial misconduct amounting to a violation of his constitutional rights in the alleged, knowing use by the Assistant U.S. Attorney of allegedly false testimony before the grand jury proceedings and during the plea hearing in United States v. Nelson M. Blohm, Criminal Action No. 88-00048-BH. We agree with respondent. The doctrine of collateral estoppel applies to a judgment of conviction in a prior criminal case based on a guilty plea, as well as where there is a trial on the merits. Arctic Ice Cream Co. v. Commissioner, 43 T.C. 68 (1964). Furthermore, a criminal conviction based upon an indictment charging a willful attempt to evade tax in violation of section 7201 necessarily carries with it the ultimate factual determination that part of the deficiencies for the tax year involved was due to fraud as encompassed within section 6653(b). Strachan v. Commissioner, 48 T.C. 335 (1967); Amos v. Commissioner, 43 T.C. 50 (1964), affd. 360 F.2d 358 (4th Cir. 1965). The rule in the Federal courts is that the pendency *725 of an appeal does not suspend the operation of a final judgment for collateral estoppel purposes, except where appellate review constitutes a trial de novo. Huron Corp. v. Lincoln Co., 312 U.S. 183, 188-189, 85 L. Ed. 725, 61 S. Ct. 513 (1941); 18 Wright, Miller & Cooper, Federal Practice and Procedure, sec. 4433 at 308 (1981). Here the U.S. District Court for the Southern District of Alabama entered a judgment on August 30, 1988, based on petitioner's guilty plea to a violation of section 7201. There was no appeal taken therefrom. The District Court clearly and correctly in our view decided that the August 30, 1991, judgment was based on a voluntarily entered plea agreement as advised by counsel and denied the motion to vacate. The district court judge who dismissed the motion to vacate was the same judge before whom petitioner appeared at his plea hearing. See, e.g., United States v. Boggs, 612 F.2d 991, 993 (5th Cir. 1980). [14] Petitioner's appeal of the March 26 and May 13, 1991, orders denying the motions to vacate and for reconsideration does not relate to the original judgment, but the motion to vacate filed over 2-1/2 years later. The appellate review does *726 not involve a trial de novo. See Matthews v. United States, 569 F.2d 941 (5th Cir. 1978), (stating that a District Court's findings of fact are upheld unless they are clearly erroneous). Thus, pursuant to the rules of Arctic Ice Cream Co. v. Commissioner, supra, and Amos v. Commissioner, supra, the doctrine of collateral estoppel applies to the District Court's judgment entered on August 30, 1988, based on petitioner's guilty plea to the section 7201 violation.
Petitioner contends that collateral estoppel should not apply to the August 30, 1988, judgment because his constitutional rights were violated and the guilty plea coerced by alleged prosecutorial misconduct (the alleged known use of false testimony and making *727 false representations at the plea hearing relating to petitioner). The allegedly false statements are that the funds were transferred to the Cayman Islands on February 18, 1981, and that there was a debt owed to the "Stickelberger [sic] Foundation" which was canceled later in 1981. This contention was presented as support for the motion to vacate and rejected by the District Court. We agree with the District Court. Petitioner's guilty plea was voluntarily entered on the advice of counsel. Any misstatements or discrepancies were inadvertent, minor, and immaterial. Furthermore, petitioner's assertion that there was no debt from him to the trust is negated by the reporting of forgiveness of indebtedness income on petitioners' amended tax return for the taxable year 1983. In view of our conclusion that any misstatements at petitioner's plea hearing were inadvertent, minor, and immaterial, the cases cited by petitioner in support of this contention are inapplicable. C. Conclusion
Accordingly, we conclude that respondent correctly determined the deficiency which relates to the Cayman Islands and Kitchen Table Kickbacks [15] and that petitioner is collaterally estopped to deny *728 that he is liable for the addition to tax under section 6653(b). To reflect our conclusions regarding the issues, Decision will be entered for the respondent. Footnotes
1. Unless indicated otherwise, all section references are to the Internal Revenue Code as amended and in effect for the year in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. On October 15, 1982, and October 11, 1985, respondent made adjustments to petitioners' taxable income for the taxable year 1981 which resulted in $ 105,701.10 in additional Federal income tax. These adjustments are not in issue. ↩
3. The parties have stipulated that JoAnn M. Blohm is not liable for the addition to tax pursuant to sec. 6653(b)↩ "relating to civil fraud penalty and interest."
4. The beneficiaries of the trust were Stickelber, his brother, and his sister's children.↩
5. Petitioners' Federal income tax return for 1981 reflects that 40,000 shares were sold, but testimony and an exhibit prepared by petitioner's accountant show that 30,000 shares were sold.↩
6. The parties did not introduce a copy of any other contract or document transferring the remaining half interest in the Jourdanton Prospect to Marion.↩
7. This type of plea is known as an Alford plea after North Carolina v. Alford, 400 U.S. 25, 27 L. Ed. 2d 162, 91 S. Ct. 160↩ (1970).
8. A similar argument was presented in support of the motion to vacate and rejected by the District Court.↩
9. In granting respondent's motion to be relieved from Stipulation of Facts No. 22, we noted that there is no credit advice bank record of the transfer from Marion to the Marion Coal account in the Cayman Islands in evidence. We concluded that the evidence in the record supports that the transfer from Marion to the Marion Coal account took place on Feb. 18, 1981.↩
10. Petitioner asserts also that the debt to the trust was nonrecourse and contingent, and thus, its cancellation would not have resulted in taxable income to petitioners. However, we note that petitioners reported forgiveness of indebtedness income on their amended tax return for the taxable year 1983.↩
11. See Hanhauser v. Commissioner, T.C. Memo 1978-504↩, which involved kickbacks from suppliers to the taxpayer's corporation, which he directed be paid directly to or on behalf of a corporation owned by his girlfriend. This Court concluded that the kickbacks were taxable to the taxpayer.
12. See also Hanhauser v. Commissioner, supra↩.
13. See Hyland v. Commissioner, 175 F.2d 422 (2d Cir. 1949); Evans v. Commissioner, T.C. Memo 1988-228; Haack v. Commissioner, T.C. Memo 1981-13; Kahn v. United States, an unreported case ( W.D.N.C. 1981, 1981 U.S. Dist. LEXIS 10858, 47 A.F.T.R.2d (RIA) 814, 81-1 U.S. Tax Cas. (CCH) P9187↩).
14. In Bonner v. City of Prichard, 661 F.2d 1206↩ (11th Cir. 1981), the Eleventh Circuit Court of Appeals stated that it was adopting as precedent the decisions of the former Fifth Circuit issued before Oct. 1, 1981.
15. Petitioners introduced evidence at trial that the computation in the notice of deficiency was incorrect in several respects. However, this was not specifically alleged in the petition, and there was no such argument made in their briefs. Thus, we consider this argument as either not raised or abandoned. Cf. Sundstrand Corp. v. Commissioner, 96 T.C. 226, 348 (1991); Hockaden & Associates, Inc. v. Commissioner, 84 T.C. 13, 16 n.3 (1985), affd. 800 F.2d 70↩ (6th Cir. 1986).