Nelson M. BLOHM and JoAnn M. Blohm, Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

No. 92–6509.

United States Court of Appeals, Eleventh Circuit.

July 9, 1993.

Thomas Troy Zieman, Jr., Miller, Hamilton, Snider & Odom, Mobile, AL, for petitioners-appellants.

Abraham N.M. Shashy, Jr., Chief Counsel, I.R.S., Washington, DC, Robert W. West, Dist. Counsel, I.R.S., Birmingham, AL, Charles S. Casazza, Clerk of U.S. Tax Court, S. Robert Lyons, Gary R. Allen, Brian C. Griffin, Charles E. Brookhart, Tax Div., U.S. Dept. of Justice, Washington, DC, for respondent-appellee.

Before DUBINA, Circuit Judge, CLARK and ESCHBACH *, Senior Circuit Judges.

---

* Honorable Jesse E. Eschbach, Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

DUBINA, Circuit Judge:

Appellants Nelson M. Blohm ("Blohm") and JoAnn M. Blohm[1] appeal a judgment from the United States Tax Court upholding an Internal Revenue Service ("IRS" or the "Commissioner") deficiency notice alleging that the appellants owed taxes on unreported income. We affirm.

## I. FACTS

This tax deficiency case revolves around the nefarious business activities of Blohm and his business associates, Merlin C. Stickelber ("Stickelber") and Charles Ritchey ("Ritchey"). The facts are largely based upon the Tax Court's detailed findings.

Blohm was president and chief operating officer of Marion Corporation ("Marion"), a large oil exploration firm located in Mobile, Alabama. Stickelber was Marion's chairman of the board of directors and chief executive officer. Ritchey was vice-president of Marion's Oil and Gas Division. This case emanates from two business schemes whereby portions of certain monies used by Marion to purchase oil leases were "kicked back" to Blohm, Stickelber and Ritchey, who subsequently failed to report that income on their federal tax returns. The kickback schemes are discussed in turn.

### A. The Cayman Islands Transaction

In 1981 several independent oil and gas operators and landsmen[2] from Texas (the "Texas Group") approached Ritchey and proposed that Marion buy a group of oil leases known as the Jourdanton Prospect. As part of the deal at least one-half of the purchase price was to be paid in the Cayman Islands through Marion Coal, Marion's Cayman Islands subsidiary. The Texas Group promised to "kick back" a portion of this money to representatives of Marion. Ritchey discussed the proposed scheme with Stickelber,

who agreed to it. That same day, Stickelber alerted Blohm who also agreed to the proposal.

The purchase price for the Jourdanton Prospect was $2,578,825. A member of the Texas Group executed a contract to sell one-half of his interest in the Jourdanton Prospect to Marion Coal for $1,289,412.50.[3] Marion Coal's president signed the contract of sale. Stickelber co-signed the check paying for the purchase. At the time of these events, Marion was a Fortune 500 company. Marion's purchase of the Jourdanton Prospect was the largest single purchase in its history.

On February 17, 1981, Stickelber, Ritchey and the Texas Group flew to the Cayman Islands. There they met with attorneys retained to set up several shell corporations to shield the kickback proceeds. Stickelber had arranged to have the $1,289,412.50 purchase price wire transferred to the Cayman Islands that day. The funds, however, did not arrive. Stickelber made several phone calls to ensure the money's arrival by the next day, February 18th. On the 18th, Stickelber, Ritchey and the Texas Group met again the attorneys who then established three shell corporations: San Pedro Finance Company ("San Pedro"), St. Lucy Investment Co., Ltd. ("St. Lucy") and Linfield Investment, Ltd. ("Linfield"). San Pedro was owned by the Texas Group, Stickelber, Ritchey and Blohm. St. Lucy was owned one-third each by Stickelber, Ritchey and Blohm. Linfield was owned by the Texas Group. Stock certificates were issued for each owner, including Blohm who held one share of San Pedro class "B" stock and one ordinary share of St. Lucy stock.

The same day a wire transfer from Marion was received by The Bank of Nova Scotia, Cayman Islands, for the account of Marion Coal in the amount of $1,289,412.50. The next day, that money was transferred from

---

1. Nelson M. Blohm and JoAnn M. Blohm are referred to collectively throughout as the "Blohms."

2. An oil and gas landsman obtains oil and gas leases from various land owners and leasehold owners in an area with production potential and sells the leases to an oil exploration company.

3. The parties did not introduce a copy of any other contract or document transferring the remaining half interest in the Jourdanton Prospect to Marion.

the Marion Coal account to the San Pedro account. The following amounts were then transferred from the San Pedro account to the St. Lucy and Linfield accounts:

1. San Pedro to St. Lucy: $ 429,374.36
2. San Pedro to Linfield: 860,038.14

**TOTAL:** $1,289,412.50

The $429,374.36 transferred to the St. Lucy account owned by Stickelber, Ritchey and Blohm is referred to as the "Cayman Islands kickback." Blohm did not travel to the Cayman Islands in 1981.

Stickelber, Ritchey, Blohm and each member of the Texas Group signed an indemnity agreement in favor of Cayhaven Corporate Services Ltd. ("Cayhaven") as agent for San Pedro. Stickelber, Ritchey and Blohm, as beneficial owners of St. Lucy, each signed a second indemnity agreement in favor of Cayhaven as agent for St. Lucy. Cayhaven invested the St. Lucy funds in a series of short-term certificates of deposit, where they remained for about one year. Several disbursements and loans were made to Stickelber and Ritchey. No disbursements are known to have been made to Blohm.

In November 1982 Blohm and Stickelber signed affidavits to dissolve St. Lucy. The affidavits were notarized by Blohm's secretary. The one-page affidavits contained no corporate titles under the signatures. The Blohms did not report any portion of the Cayman Islands kickback on their 1981 joint tax return.

*The Promissory Notes*

Stickelber took Blohm's share of the money in the St. Lucy account ($143,268) to satisfy a $282,750 debt Blohm owed to a trust

settled by Stickelber's father of which Stickelber was co-trustee (the "Stickelber Trust"). In 1982 or 1983, Stickelber canceled Blohm's entire debt to the Stickelber Trust. On their joint amended federal income tax return for 1983, which was filed in 1985, the Blohms reported income totalling $282,750 from the discharge of the indebtedness to the trust.

### B. *Kitchen Table Transaction*

A second scheme surfaced in 1981. This time the Texas Group approached Ritchey about purchasing another group of leases known as the Stuart City Prospect. This plan also involved a kickback of a portion of the purchase price to Marion representatives. Ritchey explained the proposal to Stickelber and Blohm, who both agreed to it.

Ritchey flew to Seguin, Texas and returned to Alabama with a box filled with cash.[4] He took it to Blohm's home and there divided the money equally with Stickelber and Blohm. The payment is referred to throughout as the "Kitchen Table kickback." The Blohms did not report any portion of the Kitchen Table kickback on their 1981 joint tax return.

### II. PROCEDURAL HISTORY

In 1986 the government granted immunity from prosecution to Ritchey in exchange for evidence of tax fraud committed by Blohm and others. In 1988 a grand jury indicted Blohm for tax evasion in violation of 26 U.S.C. § 7201.[5] JoAnn M. Blohm was not indicted. Blohm pled guilty, but denied guilt pursuant to *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).[6]

---

4. The exact amount of cash is unknown. Stickelber testified that the box contained more than $300,000. (R.II–368.) Ritchey testified that the amount was $377,000. (R.III–489.) On cross-examination, Stickelber acknowledged that he had earlier indicated that the amount was less than $300,000. (R.II–412, 414–15.)

5. Section 7201 of Title 26 of the United States Code states:

Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,-

000 in the case of a corporation), or imprisoned not more than 5 years, or both, together with the costs of prosecution.

6. In *Alford* the Supreme Court addressed the question of whether an express admission of guilt is required before a court may impose sentence upon a defendant who pleads guilty but nonetheless maintains his or her innocence. The defendant in *Alford* pled guilty to murder, but maintained his innocence. During his arraignment, Alford denied committing the crime, but elected to plead guilty to avoid the death penalty should he be convicted at trial. The Supreme Court affirmed the conviction and the imposition of sentence, holding that

The district court entered judgment against him. Blohm moved to vacate his sentence, quash the indictment or grant a new trial. He alleged prosecutorial misconduct causing a violation of his constitutional rights in two respects: (1) that the indictment was based solely on Ritchey's affidavit, which, Blohm claimed, the government knew to be false, and (2) that his guilty plea was coerced by the government's making a false offer of proof at his plea hearing.

After conducting a hearing, the district court denied the motion to vacate, concluding that Blohm's claims were procedurally barred because he failed to raise them on direct appeal from his conviction and sentence. Alternatively, the district court determined that there were no violations of Blohm's constitutional rights, that Blohm's guilty plea was voluntary and that the discrepancies between Ritchey's affidavit and other records were "minor" and "immaterial." The district court denied Blohm's motion for reconsideration and Blohm appealed. In an unpublished opinion, we affirmed the district court's alternative holding. *Blohm v. United States*, 964 F.2d 1147 (11th Cir.1992) (per curiam).

### A. *The Notice of Deficiency*

Shortly after Blohm pled guilty in 1988, the Commissioner issued the Blohms a notice of deficiency for $269,035 of unreported income from the Cayman Islands kickback ($143,268) and the Kitchen Table kickback ($125,767). As to the former, the Commissioner alleged that Blohm applied his one-third share of the proceeds to cancel the debt he owed to the Stickelber Trust. The claimed tax deficiency totalled $133,749. The Commissioner further determined an addi-

[w]hile most pleas of guilty consist of both a waiver of trial and an express admission of guilt, the latter element is not a constitutional prerequisite to the imposition of a criminal penalty. An individual accused of crime may voluntarily, knowingly, and understandably consent to the imposition of a prison sentence if he is unwilling or unable to admit his participation in the acts constituting the crime.

400 U.S. at 37, 91 S.Ct. at 167. Guilty pleas accompanied by assertions of innocence have come to be known as *"Alford"* pleas.

tion to tax of $119,725 under 26 U.S.C. § 6653(b)[7]. The determination was based upon Blohm's guilty plea, an affidavit of Ritchey and a letter from Stickelber to an IRS agent in which he linked Blohm to both the Cayman Island and Kitchen Table kickbacks. The Blohms petitioned for a redetermination before the Tax Court.

### B. *Proceedings Before The Tax Court*

Prior to trial the Blohms moved to strike Ritchey's testimony and to supplement the record. The government moved for relief from the binding effect of the parties' stipulation of facts. The Tax Court denied the Blohms' motion to strike Ritchey's testimony but granted their motion to supplement the record. The Tax Court denied as premature the government's motion for relief from the stipulated facts.

At trial the government renewed its motion for relief from the binding effect of certain stipulations of fact because the evidence did not support those stipulations. Specifically, stipulation twenty-two incorrectly averred that the $1,289,412.50 transferred from Marion to the account of Marion Coal occurred on February 19, 1981. The record demonstrated that the correct date was one day earlier, February 18, 1981. Noting that it was not bound by facts contrary to evidence in the record, *Kirchner, Moore & Co. v. Commissioner*, 54 T.C. 940, 1970 WL 2264 (1970), *aff'd*, 448 F.2d 1281 (10th Cir.1971), the court granted the motion as to stipulation twenty-two. It denied the motion as to other challenged stipulations.

■ The Tax Court upheld the deficiency determination. *Blohm v. Commissioner*, 62 T.C.M. (CCH) 1586, 1991 WL 271600 (1991).

7. Section 6653(b) of Title 26 of the United States Code states in pertinent part:
(b) Fraud.—
(1) **In general.**— If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 75 percent of the portion of the underpayment which is attributable to fraud.
The parties have stipulated that JoAnn M. Blohm is not liable for the addition to tax pursuant to § 6653(b).

It determined that (1) Blohm earned the Cayman Islands kickback by arranging Marion's purchase of the Jourdanton Prospect leases and that the kickback was therefore taxable income; (2) Blohm derived $125,767 in unreported income from the Kitchen Table kickback; and (3) Blohm was collaterally estopped from denying liability for the additional tax for fraud under 26 U.S.C. § 6653(b) because of his guilty plea to tax evasion under 26 U.S.C. § 7201. The Tax Court denied the Blohms' motion to vacate or revise its decision and their motion for reconsideration of findings and opinion.[8] The Blohms perfected this appeal.[9]

## III. ANALYSIS

The Blohms advance three arguments in this appeal. First, they argue that the Tax Court incorrectly found them liable for tax deficiencies in 1981 based on purported income from the Cayman Islands and Kitchen Table kickback schemes. Second, they argue that the Tax Court erroneously refused to be bound by stipulation of fact number twenty-two. Last, Blohm contends that the Tax Court incorrectly applied collateral estoppel to preclude him from denying civil liability for tax fraud because of his *Alford* plea to tax evasion in the district court.

---

**8.** The motions were denied with unusually harsh language from the court:

> The new allegations made are based on [the Blohms'] blatant misstatements of the findings of fact and opinion of this Court. In our view, this transcends mere advocacy and borders on an affront to the Court. We must admonish [the Blohms'] counsel that any continuation of his egregious distortion of the record in this case will be considered frivolous and will be dealt with appropriately.

Tax Court Order of March 12, 1992 at 2.

**9.** Because the Tax Court ruled that Blohm earned $143,268 from the Cayman Islands kickback and thus should have reported that money as income, the Blohms filed a tax refund action in federal district court seeking, *inter alia*, a refund for taxes paid for 1983 on the forgiveness of debt. They claimed that they faced double taxation for the taxes due on the Cayman Islands kickback proceeds and those paid on the 1983 satisfaction of debt. The district court found that the Blohms failed to comply with the statute of limitations. *Blohm v. United States,* No. 91–

We review the Tax Court's fact findings for clear error. *Atlanta Athletic Club v. Commissioner,* 980 F.2d 1409, 1411 (11th Cir.1993). A finding of fact is clearly erroneous "if the record lacks substantial evidence to support it," *Thelma C. Raley, Inc. v. Kleppe,* 867 F.2d 1326, 1328 (11th Cir.1989), such that our review of the entire evidence leaves us "with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948); *see also Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). The Tax Court's rulings on the interpretation and application of the statute are conclusions of law reviewed *de novo. Estate of Wallace v. Commissioner,* 965 F.2d 1038, 1044 (11th Cir. 1992). Moreover, whether a taxpayer received income is an ultimate fact and as such is to be treated as a legal rather than a factual determination to be reviewed *de novo. Weiss v. Commissioner,* 956 F.2d 242, 244 (11th Cir.1992).

### A. *Presumption of Correctness*

Ordinarily, the Commissioner's determination of tax liability is presumed correct. *Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933); Tax Court Rules of Practice and Procedure 142(a). The

---

0831–B–C, 1993 WL 117988 (S.D.Ala. Jan. 19, 1993). Moreover, the district court held that the Blohms' assertions of equitable estoppel and equitable recoupment, two exceptions to the limitations requirement, were inapplicable. The district court further found that the Blohms' third claimed basis for an exception to the limitations requirement, mitigation, was unripe because the Tax Court's decision had yet to become "final" pursuant to 26 U.S.C. § 7481. Once appealed to the Court of Appeals, a Tax Court decision does not become final until (1) the decision has been affirmed by the Court of Appeals and no petition for certiorari has been timely filed or, if filed, the petition for certiorari has been denied, or (2) the decision has been reversed or modified by the Court of Appeals and no petition for certiorari has been timely filed or, if filed, the petition for certiorari has been denied, and, if the case has been remanded to the Tax Court for rehearing, the Tax Court has rendered its decision upon rehearing. *See* 26 U.S.C. § 7481. Thus, any relief due the Blohms for double taxation may appropriately be sought in a refund action in federal district court once the Tax Court's decision becomes final.

taxpayer, therefore, bears the burden of proving the determination erroneous or arbitrary. *Welch*, 290 U.S. at 115, 54 S.Ct. at 9; *Webb v. Commissioner*, 872 F.2d 380, 381 (11th Cir.1989). For the presumption to adhere in cases involving the receipt of unreported income, however, the deficiency determination must be supported by "some evidentiary foundation linking the taxpayer to the alleged income-producing activity." *Weimerskirch v. Commissioner*, 596 F.2d 358, 362 (9th Cir.1979). Although a determination that is unsupported by such a foundation is clearly arbitrary and erroneous, *id.*, the required showing is "minimal." *Carson v. United States*, 560 F.2d 693, 697 (5th Cir.1977) (quoting *Gerardo v. Commissioner*, 552 F.2d 549, 554 (3rd Cir.1977)).[10] Once the Tax Court has found that this minimal evidentiary showing has been made, the deficiency determination is presumed correct, and it becomes the taxpayer's burden to prove it arbitrary or erroneous. *Gold Emporium, Inc. v. Commissioner*, 910 F.2d 1374, 1378 (7th Cir.1990).

The Tax Court noted the following evidence to support its conclusion that the Commissioner had met her initial burden as to the Cayman Islands kickback scheme: 1) Stickelber's testimony that he presented the Cayman Islands kickback proposal to Blohm, who agreed to it, and that Blohm was a one-third owner of St. Lucy; 2) Ritchey's testimony that the terms of the Cayman Islands kickback were discussed with Blohm, including that he would take a one-third share of the kickback; 3) the affidavit to dissolve St. Lucy signed by Blohm as one of the two beneficial owners thereof and notarized by Blohm's secretary; and 4) the indemnity agreements signed by Blohm as a beneficial owner of San Pedro and St. Lucy in favor of Cayhaven.

As to the Kitchen Table kickback scheme, the Tax Court cited: 1) Stickelber's testimony that Ritchey presented the proposal to Stickelber and Blohm at the same time, and both agreed to it; 2) Stickelber's and Ritchey's testimony that the Kitchen Table kickback was divided equally among the three of them; 3) the fact that Blohm admitted that Ritchey and Stickelber came to his home on the night the proceeds were divided, that Ritchey said something about a Texas Santa Claus when he brought the money into the house, and that Blohm found a sack of money on the kitchen table the next morning; 4) Ritchey's testimony that Blohm never returned the money; and 5) Blohm's assertion that he put the money in the trunk of his car for several days to a week.

The above evidence establishes a sufficient evidentiary foundation linking Blohm to the Cayman Islands and Kitchen Table kickback schemes; the presumption of correctness therefore applies. Moreover, we find no error in the Tax Court's conclusion that Blohm failed to meet his burden of proving the Commissioner's determination arbitrary or erroneous.

### B. *The Kickback Schemes.*

The Blohms mount a double-barrelled attack on the Tax Court's judgment. First, they challenge the Tax Court's legal analysis and fact findings as to the Cayman Islands kickback scheme. Second, they attack the credibility of the evidence against Blohm as to the Kitchen Table kickback, primarily the evidence given by Stickelber and Ritchey.

Gross income includes all income from "whatever source derived." 26 U.S.C. § 61(a)(1). Kickbacks are taxable income. *See, e.g., Bragg v. Commissioner*, 856 F.2d 163, 165 (11th Cir.1988); *United States v. Sallee*, 984 F.2d 643, 647 (5th Cir.1993). Income is taxed to the party who earns it. *Commissioner v. Bollinger*, 485 U.S. 340, 346, 108 S.Ct. 1173, 1177, 99 L.Ed.2d 357 (1988). A taxpayer is not relieved of the obligation to pay taxes on earned income merely by a transfer of that income to another party. *United States v. Basye*, 410 U.S. 441, 449–51, 93 S.Ct. 1080, 1085–86, 35 L.Ed.2d 412 (1973). Thus, if the evidence supports a finding that Blohm participated in either kickback scheme, then all income attributable to him is to be taxed. We must,

---

10. As stated by the *Carson* court, "[t]he tax collector's presumption of correctness has a herculean muscularity of Goliathlike reach, but we strike an Achilles' heel when we find no muscles, no tendons, no ligaments of fact." 560 F.2d at 696.

therefore, determine whether the evidence supports the Tax Court's conclusion that Blohm participated in both kickback schemes, and by so doing, earned the proceeds derived from them.

### 1. *The Cayman Islands Kickback.*

 The Tax Court held that Blohm earned the Cayman Islands kickback by participating in Marion's purchase of the Jourdanton Prospect leases and directing that his share of the kickback proceeds be paid to St. Lucy, the corporation he formed with Stickelber and Ritchey for the sole purpose of receiving illegal kickback proceeds. 62 T.C.M. at 1593.

The Blohms argue that the Tax Court erred in concluding that the proceeds of the Cayman Islands kickback were income taxable to them. Their arguments emanate from the bedrock assertion that Blohm took no part in the Cayman Islands kickback scheme. In fact, Blohm testified that he knew nothing of the Cayman Islands corporations until 1985. (R.II–279.) He further claims that he was never a shareholder in either the San Pedro or St. Lucy corporations. (R.II–256–57.) He testified that he had no recollection of signing the various documents relevant to the forming and dismantling of San Pedro or St. Lucy. (R.II–257–59.) He claims that if he did sign those documents, he did so without reading them because, as president of Marion, he signed many documents. Blohm further testified that Stickelber canceled his debt to the Stickelber Trust not in exchange for his share of the Cayman Islands kickback proceeds but to entice Blohm to remain with Marion after Blohm threatened to resign. (R.II–267–68.) According to Blohm, Stickelber's testimony that he kept Blohm's share of the Cayman Islands kickback proceeds in exchange for cancellation of Blohm's debt to the Stickelber Trust was simply a lie, as was all of Stickelber and Ritchey's testimony linking him to the Cayman Islands kickback scheme. In short, the Blohms assert that no plausible evidence links Blohm to knowledge of and participation in the Cayman Islands kickback scheme. Therefore, they claim, because Blohm neither knew of nor benefitted from

the Cayman Islands scheme, any proceeds from that illicit transaction cannot be attributed to them as gross income.

These contentions, however, fail to prove the Tax Court's conclusions arbitrary or erroneous. *Gold Emporium,* 910 F.2d at 1378. The Tax Court's conclusions are amply supported by the evidence. Stickelber testified that he presented the Cayman Islands kickback proposal to Blohm, who agreed to participate in it:

A. (Stickelber) Mr. Ritchey brought the project to me, and I concurred that they could do it—that we would handle it through the Cayman Island—the coal company group and that the share of their half of the lease bonus would be divided two-thirds to them and one-third to whomever. And that whomever is defined as one-third to me, one-third to Mr. Blohm, and one-third to Mr. Ritchey.

Q. Okay. When this offer was made by the Texas Group, did you tell Mr. Blohm?

A. I did.

Q. How did you tell him?

A. Well, I just told him that this was the proposition, and this is the way it would—to use the vernacular, this is the way it was going to come down. And that was the proposal on their part. They were willing to share their part of the profit with us. And we would do it through the Cayman Islands centrum.

. . . .

Q. (The Court) Well, I want to know what was your impression as to his reaction.

A. My impression is that his reaction is that he concurred with the transaction that we presented—that I presented.

(R.II–320–24.) Stickelber further testified that Blohm authorized him to represent Blohm's interests in the Cayman Islands transactions. (R.II–354.)

Ritchey testified that the terms of the Cayman Islands kickback were discussed with Blohm, including Blohm's one-third share in its proceeds:

Q. How were the [Cayman Islands] rebate monies to be divided?

A. A third, a third, a third, with a third to Mr. Stickelber, a third to Mr. Blohm, and a third to myself.

Q. Was that division communicated to Mr. Blohm?

A. Yes, it was.

Q. When—how was it—when was it communicated to him?

A. Well, as I stated previously, in a conversation in Mr. Stickelber's office.

Q. Was that prior to the—to February—to your trip to the Cayman Islands?

. . . .

A. Yes, it was.

(R.III–468.)

Furthermore, documentary evidence supported the conclusion that Blohm owned one-third of St. Lucy. Blohm, as a beneficial owner of San Pedro and St. Lucy, signed several indemnity agreements in favor of Cayhaven. Blohm's personal secretary at the time, Dorothy Franco, notarized these agreements and testified that she never notarized unsigned documents. (R.III–448.) As a beneficial owner of St. Lucy, Blohm also signed an affidavit to dissolve St. Lucy; that affidavit was also notarized by Ms. Franco.

The Tax Court also noted the circumstantial evidence against Blohm. The Jourdanton Prospect purchase was the single largest purchase made by Marion at that time. The Tax Court found that Blohm, as president of Marion and a director, would almost certainly have been thoroughly familiar with the transaction, including the payment through Marion Coal in the Cayman Islands and Marion Coal's taking title to one-half interest in the Jourdanton Prospect. Moreover, the Tax Court found implausible Blohm's assertion that he unwittingly signed the affidavit dissolving St. Lucy. Blohm signed that affidavit in his individual capacity, and not as president of Marion.

Although not necessary to its holding, the Tax Court's conclusion that Blohm applied his proceeds to cancel his debt to the Stickelber Trust was also supported by the evidence. Stickelber testified that he used Blohm's share of the Cayman Islands kick-back ($143,268) to cancel the balance of Blohm's debt of $282,750 out of a sense of obligation arising from a separate transaction in which Blohm unfairly lost a business opportunity. (R.II–384.) This testimony supports the Tax Court's explanation as to why there are no known bank documents evidencing disbursements from the Cayman Islands accounts to Blohm. The promissory notes help explain why no funds went to Blohm directly. Moreover, Stickelber testified that in early 1982 he "canceled" the promissory notes and back-dated the cancellation to "December 1977" at Blohm's request to create the impression that the notes were canceled before the Cayman Islands kickback occurred. (R.II–366–67.)

We agree with the Tax Court's conclusion that Blohm knew of and participated in the Cayman Islands kickback scheme. The Tax Court's fact findings resulted from careful consideration of the evidence and were based upon reasonable credibility choices among persons of dubious virtue. The court's findings were not clearly erroneous. In short, the evidence amply supports the view that Blohm acceded to the Cayman Islands kickback scheme ahead of time and directed that his share of the proceeds be paid to St. Lucy, one of two shell corporations set up for the sole purpose of harboring the kickback funds and in which he held beneficial ownership. One-third of the proceeds of the Cayman Islands kickback scheme was therefore income earned by Blohm and taxable to him as a one-third owner of St. Lucy.

### 2. *The Kitchen Table Kickback*

■ The Blohms also attack the Tax Court's fact findings regarding the Kitchen Table kickback as clearly erroneous. They argue that the testimony of Stickelber and Ritchey, upon which the Tax Court relied, is inconsistent, contrary to agreed upon stipulations, and self-contradictory.

■ Their strongest salvos are aimed at Ritchey, who the Blohms claim is a crook and therefore unreliable. The former is clear; the latter is not. The Blohms correctly state that Ritchey gave evidence "not presently available to the Grand Jury" in exchange for

immunity from prosecution. They claim that Ritchey was forced to create false evidence against Blohm to save himself from prosecution. That Ritchey agreed to provide new evidence does not, alone, make him inherently incredible. *See, e.g., United States v. Greenwood,* 974 F.2d 1449, 1457 (5th Cir. 1992). Indeed, while the Tax Court found Ritchey to be unsavory, it nonetheless credited his testimony:

> We hold no esteem for Ritchey, who appears to be the instigator of this insidious, nefarious, and reprehensible scheme as far as the Marion group was concerned, and we consider it anomalous that Ritchey might bear less a brunt or taint than the others of the consequences of this evil plot. Nevertheless, while we do not find Ritchey to be an ideal witness, we find his testimony plausible in context with the testimony of Stickelber and all the circumstances extant.

62 T.C.M. at 1592. Ritchey's character and the extent of his cooperation with the government were well known to the Tax Court; his motives and credibility were for it to consider in its role as fact finder. *See Amadeo v. Zant,* 486 U.S. 214, 223, 108 S.Ct. 1771, 1777, 100 L.Ed.2d 249 (1988). We find no clear error.

The Blohms also challenge the Tax Court's fact findings as to the specific dollar amount of the proceeds of the Kitchen Table kickback. No paperwork documented the transaction. Blohm's memory regarding the Kitchen Table kickback was hazy. He testified that Stickelber and Ritchey came to his home one evening and that he remembered "a lot of drinking of alcohol." (R.II–282.) He testified that he had no recollection of what was said that evening beyond Ritchey saying "something about a Texas Santa Claus when he was bringing money into the house." *Id.* Blohm further testified that he found a brown sack the next morning containing a "few thousand" dollars on a counter, and that he put the money into his car trunk and kept it for "at least a week" before returning the money to Ritchey. (R.II–284.)

The Tax Court discounted Blohm's testimony, relying in large part upon the testimony of Stickelber. As noted by the Tax Court:

> [Blohm] testified that there were a few thousand dollars in the sack [left on the counter after the kickback money was divided]. However, we find his version of this to be incredible, including the aspect where he supposedly put the few thousand dollars in his car truck for several days to a week. [Blohm] did not introduce any other evidence regarding the amount of the Kitchen Table Kickback. Stickelber testified that it was $300,000 plus in total, and Ritchey testified that it was $377,000. They both testified that the cash was in denominations ranging from $20 bills to $100, and that the total was divided equally among the three. On cross-examination, Stickelber acknowledged that in his letter to the Internal Revenue Service he indicated that the amount of his share of the Kitchen Table Kickback was at least $75,000, and that in a deposition taken in a civil lawsuit by Marion against the Texas Group, Stickelber, Ritchey and [Blohm], he testified that the total was $210,000 and his share was $70,000.

62 T.C.M. at 1594. The Tax Court found Blohm's version of the Kitchen Table kickback to be "evasive, implausible, and incredible." *Id.* It concluded that since Blohm failed to present credible evidence regarding the amount of the Kitchen Table kickback, he "failed to show that the determination in the notice of deficiency of his share of the Kitchen Table kickback of $125,767 was incorrect." *Id.* at 1595. The Tax Court's fact findings were not clearly erroneous. Accordingly, we agree with its conclusion that the proceeds derived by Blohm from the Kitchen Table kickback scheme were income taxable to him.

C. *Stipulation of Fact Number Twenty-two*

Stipulation twenty-two provides: "On February 19, 1981, a wire transfer from Marion to Marion Coal Corporation was received by the Bank of Nova Scotia, Cayman Islands, for the amount of $1,289,412.50. The transfers are attached as Exhibit '8–H'."

As noted, the Commissioner moved for relief from the binding effect of certain stipulations of fact because the evidence did not support them. Among them was stipulation

twenty-two. This stipulation incorrectly averred that the $1,289,412.50 transferred from Marion to the account of Marion Coal occurred on February 19, 1981. The record demonstrated that the correct date was one day earlier, February 18, 1981. The court therefore granted the Commissioner's motion.

While stipulations are not to be set aside lightly, courts have broad discretion in determining whether to hold a party to a stipulation. *See Morrison v. Genuine Parts Co.*, 828 F.2d 708 (11th Cir.1987), *cert. denied*, 484 U.S. 1065, 108 S.Ct. 1025, 98 L.Ed.2d 990 (1988); *Wheeler v. John Deere Co.*, 935 F.2d 1090 (10th Cir.1991).

The Blohms argue that the stipulation's reference to February 19, 1981, as the correct date of the Cayman Islands kickback transactions confirms the "capricious use of false evidence" by the IRS because Stickelber and Ritchey were not present in the Cayman Islands on that day. This argument is meritless. The overwhelming evidence contained in the record demonstrates that the stipulated date was simply incorrect. There is both a debit advice documenting when the money was transmitted from the Marion Coal account and a credit advice documenting when this money was deposited into the San Pedro account. The debit advice refers to two dates: "19/2/81," listed on the date line, and "18/2/81," listed in the "particulars" section. The credit advice has no date in the particulars section but has "19/2/81" on the date line. The Tax Court found the date listed in the particulars section of the debit advice (18/2/81), along with Ritchey and Stickelber's testimony that the money was in the Cayman Islands when they were on the 18th, established that the money was indeed there on the 18th. The Tax Court properly found that it was not bound by facts contrary to the record. *See Mead's Bakery, Inc. v. Commissioner*, 364 F.2d 101, 106 (5th Cir.1966). Moreover, we determined in our review of Blohm's § 2255 petition that the "discrepancy of one day in the arrival time of the funds is insignificant." *Blohm v. United States*, No. 91-7422 (11th Cir. May 22, 1992) (per curiam), 964 F.2d

1147 (Table). Accordingly, we see no abuse of discretion.

### D. Collateral Estoppel and the Alford Plea.

The Tax Court held that Blohm was estopped from denying liability for the additional tax for fraud assessed under 26 U.S.C. § 6653(b) because of his *Alford* plea to tax evasion under 26 U.S.C. § 7201. Blohm claims error based on two grounds. First, he claims that collateral estoppel is inappropriate here because he was denied a fair opportunity to litigate in the district court. Second, he argues that an *Alford* plea has no collateral estoppel effect.

Collateral estoppel bars relitigation of an issue previously decided if the party against whom the prior decision is asserted had "a 'full and fair opportunity' to litigate that issue in an earlier case." *Allen v. McCurry*, 449 U.S. 90, 94–95, 101 S.Ct. 411, 414–15, 66 L.Ed.2d 308 (1980). For collateral estoppel to be invoked 1) the issue must be identical in the pending case to that decided in the prior proceeding; 2) the issue must necessarily have been decided in the prior proceeding; 3) the party to be estopped must have been a party or have been adequately represented by a party in the first proceeding; and 4) the precluded issue must actually have been litigated in the first proceeding. *In re Raiford*, 695 F.2d 521, 523 (11th Cir.1983).

Blohm's argument that he was denied a full and fair opportunity to litigate in the district court is based on his assertion that the criminal indictment against him was fraudulently obtained. He argues that the government knew or should have known that the factual basis of the indictment against him was false. The indictment was based, *inter alia*, on information provided by Ritchey. Blohm's arguments, contained in his § 2255 petition, were previously dispatched by this court. *Blohm v. United States*, No. 91-7422 (11th Cir. May 22, 1992). We need not exhume them here.

Next, Blohm argues that an *Alford* plea is analogous to a plea of *nolo*

*contendere* [11] and thus has no collateral estoppel effect in a subsequent civil proceeding. *See Hudson v. United States,* 272 U.S. 451, 455, 47 S.Ct. 127, 128, 71 L.Ed. 347 (1926); *Raiford,* 695 F.2d at 523; *Doherty v. American Motors Corp.,* 728 F.2d 334, 337 (6th Cir.1984). Blohm claims, therefore, that he should be free to relitigate the issue of fraud in his § 6653(b) proceeding. We disagree.

■ A criminal tax fraud conviction under 26 U.S.C. § 7201 estops a taxpayer from denying liability for civil fraud under 26 U.S.C. § 6653(b) for the same year. *Klein v. Commissioner,* 880 F.2d 260, 262 (10th Cir. 1989); *Carlson v. Commissioner,* 65 T.C.M. 1880, 1883, 1993 WL 27506 (1993). This is because the "elements of criminal tax evasion and of civil tax fraud are identical." *Gray v. C.I.R.,* 708 F.2d 243, 246 (6th Cir.1983). The same result attaches if the conviction is based upon a guilty plea. *Id.* (stating that "a guilty plea is as much a conviction as a jury trial"); *Manzoli v. Commissioner,* 904 F.2d 101, 105 (1st Cir.1990). Thus, for purposes of applying the doctrine of collateral estoppel, there is no difference between a judgment of conviction based upon a guilty plea and a judgment rendered after a trial on the merits. *See United States v. Killough,* 848 F.2d 1523, 1528 (11th Cir.1988); *Mazzocchi Bus Co., Inc. v. Commissioner,* 65 T.C.M. (CCH) 1858, 1865, 1993 WL 20139 (1993). The conclusive effect is the same. *Raiford,* 695 F.2d at 523.

■ The collateral consequences of a guilty plea may not be avoided by the simultaneous assertion of innocence. A guilty plea is "more than a confession which admits that the accused did various acts." *Boykin v. Alabama,* 395 U.S. 238, 242, 89 S.Ct. 1709, 1711, 23 L.Ed.2d 274 (1969). It is an "admission that he committed the crime charged against him." *Alford,* 400 U.S. at 32, 91 S.Ct. at 164; *McCarthy v. United States,* 394 U.S. 459, 466, 89 S.Ct. 1166, 1170, 22 L.Ed.2d 418 (1969). A guilty plea is distinct from a plea of *nolo contendere.* A guilty plea is an "admission of all the elements of a formal criminal charge." *McCarthy,* 394 U.S. at 466, 89 S.Ct. at 1170. A *nolo contendere* plea

is instead a "consent by the defendant that he may be punished as if he were guilty and a prayer for leniency." *Alford,* 400 U.S. at 35 n. 8, 91 S.Ct. at 166 n. 8. Guilty pleas must be rooted in fact before they may be accepted. Fed.R.Crim.P. 11(f); *Alford,* 400 U.S. at 35 n. 8, 91 S.Ct. at 166 n. 8. No similar requirement exists for pleas of *nolo contendere. Alford,* 400 U.S. at 35 n. 8, 91 S.Ct. at 166 n. 8. Courts may accept them without inquiring into actual guilt. *Id.*

■ Once accepted by a court, it is the voluntary plea of guilt itself, with its intrinsic admission of each element of the crime, that triggers the collateral consequences attending that plea. Those consequences may not be avoided by an assertion of innocence. As long as the guilty plea represents a voluntary and intelligent choice among alternative courses of action open to the defendant, *see Boykin v. Alabama,* 395 U.S. 238, 242, 89 S.Ct. 1709, 1711, 23 L.Ed.2d 274 (1969), and a sufficient factual basis exists to support the plea of guilt, *see* Fed. R.Crim.P. 11(f), the collateral consequences flowing from an *Alford* plea are the same as those flowing from an ordinary plea of guilt. Were this not so, defendants pleading guilty would routinely proclaim their innocence to reap two benefits: (1) the avoidance of a trial and a possible reduction in sentence, and (2) the extinguishment of all collateral consequences of their plea. Nothing in Rule 11 of the Federal Rules of Criminal Procedure or in *Alford* sanctions this distortion of the pleading process. As we noted in a similar context,

> A federal criminal defendant wishing to avoid a trial and any collateral effect may ask the court for permission to plead *nolo contendere.* (Citations omitted.) A defendant who fails to exercise this option cannot argue subsequently that the lack of a contested trial renders the plea ineffective for collateral estoppel purposes.

*Raiford,* 695 F.2d at 523. Assertions of innocence, therefore, do not transform ordinary guilty pleas into pleas of *nolo contendere.* Each remains distinct, and the collateral ef-

---

11. Under a plea of *nolo contendere,* a defendant does not expressly admit his guilt, but nonetheless waives his right to trial and authorizes the court for purposes of the case to treat him as if he were guilty. *Alford,* 400 U.S. at 35, 91 S.Ct. at 166.

fects of a guilty plea are undiminished by a simultaneous protestation of innocence.

Blohm cites a case in which the Ohio Court of Appeals determined that a defendant's previous *Alford* plea to arson was tantamount to a plea of *nolo contendere*, thus precluding collateral estoppel in a subsequent civil action:

> Such a plea does not constitute an admission of guilty [sic], but rather that the accused is willing to waive a trial and accept the consequences of the plea. It, however, does not act as an admission of the plea but rather is similar to the nolo contendere plea.

> Therefore, appellant's guilty plea, by way of a qualified *Alford* plea, operates in the same fashion as a nolo contendere plea for the purposes in a subsequent civil action.

> Based upon the foregoing, the plea does not operate ... to foreclose litigation on the issue of whether appellant intentionally set the fire....

*Fleck v. State Farm Ins. Co.*, No. 89–L–14–070, 1990 WL 124648 (Ohio Ct.App. Aug. 24, 1990).

We respectfully differ with the Ohio Court of Appeals. A guilty plea, even one accompanied by a claim of innocence, is not a plea of *nolo contendere*.[12] *See* Fed.R.Crim.P. 11. A guilty plea's basic chemistry is not transformed by a concurrent claim of innocence. The collateral consequences stemming from a guilty plea remain the same whether or not accompanied by an assertion of innocence. A taxpayer who enters an *Alford* plea to tax evasion under § 7201 is therefore collaterally estopped from denying fraud in a subsequent civil proceeding with respect to the same year. *Lackey v. Commissioner*, 35 T.C.M. (CCH) 1330, 1337, 1976 WL 3478 (1976). The Tax Court properly estopped Blohm from denying liability for the additional tax for fraud assessed under § 6653(b).

Finally, Blohm argues that the government violated the plea agreement. The agreement states in pertinent part: "The United States will recommend to the Court that Nelson M. Blohm receive a protective sentence, a $5,000 fine and that the tax due and owing for 1981 be determined in civil proceedings." Blohm argues that this agreement enshrines a promise that the conviction would not be used against him in civil proceedings. We disagree. The government promised that "the tax due and owing for 1981 [will] be determined in civil proceedings." Those proceedings are before us now. The plea agreement did not promise Blohm the chance to relitigate the facts underlying his guilty plea. It promised only that the "tax due and owing" would be determined in a subsequent civil proceeding. The language of the plea agreement assumes that taxes are due for the tax evasion to which Blohm pled guilty; it simply left for another day the determination of the amount.

Blohm further argues that courts should explore the circumstances "behind" a guilty plea to determine the plea's collateral effect. He claims that he did not understand that his plea might later be used against him in a civil proceeding, and thus this misunderstanding should not be used against him. He cites *Plunkett v. Commissioner*, 465 F.2d 299, 306 (7th Cir.1972), a case wherein the court estopped a taxpayer from denying civil liability for tax evasion where the taxpayer had previously pled guilty to the charge. Blohm argues that the *Plunkett* court examined the circumstances behind the plea when it noted that the "[p]etitioner did not misunderstand the terms or immediate consequences of the agreement and his plea of guilty." 465 F.2d 299 at 306. We note, however, that the court's remark in *Plunkett* was made pursuant to its examination of whether the defendant's plea was *voluntary*, not whether the defendant misperceived the plea's collateral consequences. The district court here examined Blohm thoroughly at his plea hearing

---

12. The Supreme Court's statement in *Alford* that there was no "material difference between a plea that refuses to admit commission of the criminal act and a plea containing a protestation of innocence," 400 U.S. at 37, 91 S.Ct. at 167, does not affect our holding here. *Alford* specifically addressed the question of whether an express admission of guilt was a constitutional requisite to the imposition of a criminal penalty. The Court held that, like pleas of *nolo contendere*, guilty pleas coupled with assertions of innocence did not bar entry of judgment against the defendant. *Alford* did not address in any fashion the collateral effect of such pleas.

and found the plea to be voluntary and made "with the understanding of the nature of the charge and the consequences of the plea." Blohm plea colloquy at 20. A close examination of the plea colloquy's transcript reveals no clear error.

## IV. CONCLUSION

The Blohms have failed to prove the IRS deficiency notice arbitrary or erroneous. Moreover, the Tax Court properly concluded that Blohm was collaterally estopped from denying liability for the addition to tax under § 6653(b). Accordingly, we affirm the Tax Court's judgment in all respects.

AFFIRMED.