[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-10620
Non-Argument Calendar

_____

Agency No. 17775-08

MARTIN G. PLOTKIN,

Petitioner-Appellant,

versus

COMMISSIONER OF IRS,

Respondent-Appellee.

_____

Petition for Review of a Decision of the
U.S. Tax Court

_____

(November 27, 2012)

Before CARNES, BARKETT and HULL, Circuit Judges.

PER CURIAM:

Martin Plotkin appeals pro se from an order of the United States Tax Court

denying his petition for a redetermination of his tax deficiencies for the years 1991

through 1995.  After review, we affirm.

# I.  BACKGROUND

## A.    Plotkin's Background and Business Interests

Plotkin is a highly educated, sophisticated businessman.  In 1963, he graduated from the University of Pennsylvania's Wharton School with a degree in economics.  In 1972, he earned a law degree from St. Louis University, and worked as an attorney on corporate cases for approximately two-and-a-half years.

In 1980, Plotkin purchased a controlling interest in Medigroup Enterprises, Inc. ("Medigroup Enterprises"), an entity incorporated by Harvey Friedman, the father of Plotkin's ex-wife.  Medigroup Enterprises owned and operated several nursing homes through a complex group of partnerships, corporations, and related entities.

## B.    Rolla Health Care Associates ("RHCA")

One entity related to Medigroup Enterprises was Rolla Health Care Associates, L.P. ("RHCA"), a Missouri limited partnership formed in 1978 that built and operated a nursing home in Rolla, Missouri.  At the time of its 1978 formation, RHCA had two partners:

(1) A general partner, Rolla Health Care, Inc. ("Rolla Health Care"), which owned a 1-percent interest in RHCA; and

2

(2) A limited partner, Medigroup, Inc. ("Medigroup Inc.")[1], which owned a 99-percent interest.

Plotkin incorporated the general partner, Rolla Health Care, in 1978, and by 1987 was its president, secretary, and only board member.  By 1989, Vernon Ray Lavender, a friend and coworker of Plotkin's, had become Rolla Health Care's sole officer and its only board member.

As for the limited partner Medigroup Inc., in 1987 Plotkin was Medigroup Inc.'s president, secretary, and only board member.

Plotkin also owned the stock of KSFS Investment Co. ("KSFS"), a holding corporation.  At a time not clear from the record, KSFS acquired ownership of Medigroup Inc.  Plotkin then sold his KSFS stock—which he estimated was worth between $100,000 and $150,000—to Lavender for $500 in 1987.  By 1989 (just like with Rolla Health Care), Lavender was Medigroup Inc.'s sole officer and its only board member.

In 1982, Medigroup Inc. sold its 99-percent limited partnership interest in RHCA to Lee Kling, a St. Louis businessman.  Four years later, in 1986, Kling sold the same 99-percent limited partnership interest in RHCA to Health Facilities Investment Co., Ltd. ("Health Facilities"), a limited partnership formed by Plotkin.

---

[1]Medigroup Inc. was related to, but separate from, Medigroup Enterprises.

3

In 1990, Plotkin changed the name of Health Facilities to Autumn Years Investments, L.P ("Autumn Years").

At about the same time as the Autumn Years name change, Rolla Health Care's 1-percent general partnership interest in RHCA was reallocated among Rolla Health Care, Medigroup Inc., and Lavender. The general partnership interests of Medigroup Inc. and Lavender were then converted to limited partnership interests. This reshuffling left Rolla Health Care with a general partnership interest in RHCA, and Medigroup Inc., Lavender, and Autumn Years with limited partnership interests in RHCA. Specifically, Autumn Years held a 99-percent limited partnership interest in RHCA.

## C.     Autumn Years

Plotkin had no partnership interest in Autumn Years. Autumn Years's partners included: (1) Plotkin's three children, who each owned a 25-percent interest; (2) Eva Sue Faenger, Plotkin's girlfriend between 1985 and 1990, who owned a 20-percent interest; (3) Lynn Plotkin, Plotkin's former wife, who owned a 4-percent interest; (4) KSFS, which owned a 0.8-percent interest; and (5) Medigroup Care Centers, Inc. (another company related to Medigroup Enterprises), and Management and Development Associates, Inc. (of which Plotkin was the sole shareholder), which each owned .1-percent interests. As of

4

January 2001, neither Lynn Plotkin nor Plotkin's three children were aware that they were members of the partnership.  Plotkin never drafted financial statements, filed partnership tax returns, or observed other partnership formalities with respect to Autumn Years.

Plotkin nevertheless treated the funds deposited into Autumn Years's accounts as his own.  On numerous occasions, Plotkin wrote himself checks on Autumn Years's accounts to pay personal expenses.  Plotkin also wrote checks to cover living expenses for his daughter while she was away at college and to pay Lynn Plotkin's mortgage. During the years at issue, Plotkin did not maintain bank accounts or other financial accounts in his own name

## D.    1990-1994 Payments Made to Autumn Years and Quixoti

In 1990, Plotkin helped his girlfriend, Faenger, incorporate Professional TLC, Inc. ("Professional TLC") by drafting and filing its articles of incorporation. Because Faenger had experience operating a nursing home, she and Plotkin decided that Professional TLC would lease the Rolla nursing home from RHCA. Plotkin determined the amount of rent Professional TLC would pay to RHCA ($45,000 a month, with yearly increases of $425), and Plotkin was the only person Faenger dealt with before she signed the lease.

During the course of the lease, Professional TLC paid its rent, but not

always to RHCA. Both Plotkin and Lavender personally instructed Faenger where to direct Professional TLC's rent payments, and over the years, some of the rent payments were funneled or paid directly to certain business entities. As a result, between 1991 and 1994, Professional TLC made some rent payments directly to Autumn Years. Plotkin endorsed other checks written to RHCA over to Autumn Years. Some of Professional TLC's rent payments were made to KSFS and then redirected to Autumn Years by wire or by check.

In addition to receiving funds from Professional TLC and KSFS, Autumn Years also received funds from La Mancha Properties, Inc. ("La Mancha"), a corporation that was incorporated by Lavender and had financial ties to RHCA. La Mancha received payments from both RHCA and KSFS. Some of Professional TLC's rent payments also ended up with Quixoti Corp. ("Quixoti"), a corporation owned by Plotkin.

### E.　1995 Sale of the Rolla Nursing Home

In 1995, RHCA sold the Rolla nursing home for $4.2 million. Prior to the sale, Plotkin's then-girlfriend, Barbara Nemec, expressed an interest in trying to find a buyer for the home. Nemec was a registered dietician with no real estate experience, but her brother previously owned a brokerage business. Nemec formed LTC Brokers & Consultants, Inc. ("LTC"), and hired her brother to help

6

sell the Rolla nursing home.

RHCA and LTC executed several documents authorizing LTC to act as RHCA's agent for purposes of selling the Rolla nursing home. The documents authorized LTC to receive a base commission of ten percent, plus additional allowances totaling four percent. According to Lavender, Plotkin wanted LTC to receive an increased commission because Plotkin intended to receive his share of the sale's proceeds from LTC's commission.

The Rolla nursing home eventually sold, and LTC received $588,000 in commission in July 1995. LTC then purchased a property in Umatilla, Florida, and, within months, title to that property was transferred to Nemec. She and Plotkin eventually moved into a home on the property, where they lived together through the time of the Tax Court proceedings.

## F.    Plotkin's Loan from American Bank

During the course of Plotkin's relationship with Faenger (i.e., between 1985 and 1990), they bought land in Rolla, Missouri. Plotkin made a $44,000 down payment on the land, although it was titled in Faenger's name. Plotkin and Faenger borrowed $425,000 from the American Bank of Rolla ("American Bank") to build a house on the land. Plotkin made the payments on this loan.

Following the sale of the Rolla nursing home in 1995, RHCA made a

7

$245,000 payment to American Bank.  Plotkin used proceeds from the sale of the Rolla nursing home to pay off the remaining liability on the $425,000 loan that he and Faenger had taken out to build the house in Rolla.

## G.    Plotkin's Criminal Convictions

In 1999, following a bench trial, the district court convicted Plotkin of three counts of willfully making and subscribing false income tax returns under Internal Revenue Code ("I.R.C.") § 7206(1).  The district court found that, during 1991, 1992, and 1993, Plotkin received and failed to report substantial income from the Rolla nursing home.  The court observed that Plotkin had treated funds from the nursing home as his personal income, but had not reported it as such.

The district court expressly found that Plotkin's testimony at trial was not credible.  It rejected Plotkin's argument that the funds used to pay his personal expenses were partnership distributions to Autumn Years's limited partners.  The district court explained that Autumn Years "was a sham," noting that it was not treated as a "true partnership."  Specifically, the district court found that no partnership formalities were observed, and the purported distributions were not made in accordance with the partnership agreement or the law of partnerships.

In sum, the district court found that Plotkin willfully and falsely reported his income for the years 1991, 1992, and 1993.  Plotkin was sentenced to five years of

8

probation.

## H.    Tax Court Proceedings and Opinion

In April 2008, the Internal Revenue Service ("IRS") issued a notice of deficiency to Plotkin for the years 1991 through 1995. In the notice, the IRS determined, <u>inter alia</u>, that Plotkin had received and failed to report (on Schedule C) self-employment income of $302,319 in 1991, $172,081 in 1992, $138,490 in 1993, $135,611 in 1994, and $805,246 in 1995.[2] Based on this unreported income, the IRS further determined Plotkin had income tax deficiencies of $108,652, $61,885, $52,397, $45,490, and $320,852 for the years 1991 through 1995, respectively.

Plotkin filed a petition for redetermination of his tax deficiencies in the Tax Court. Plotkin also filed a motion to dismiss the IRS's underlying notice of deficiency for lack of jurisdiction, arguing that the notice was untimely and invalid. The Tax Court denied Plotkin's motion, and the petition proceeded to trial.

After a trial, the Tax Court entered a memorandum opinion and judgment in

---

[2]A taxpayer who owned or operated a business completes Schedule C, Profit or Loss from Business, of IRS Form 1040 as part of his income tax filing to show the income and deductible expenses of the taxpayer's business for the tax year. <u>See</u> <u>Rodriguez v. Comm'r</u>, T.C.M. (RIA) 2012-286, at *5.

favor of the IRS.  As relevant here, the Tax Court concluded that the IRS had properly included payments made to the accounts of Autumn Years and Quixoti in Plotkin's Schedule C income for the years 1991 through 1994.  The Tax Court found that those payments were income to Plotkin because they were paid "as a result of his work in carrying on the business of RHCA and related entities." Specifically, the Tax Court found that Plotkin had a significant amount of control over RHCA and that he was integral to its operation; in addition to actively carrying on the major business of RHCA, Plotkin had instructed Lavender, then the sole officer of Rolla Health Care, on how to use funds from the sale of the Rolla nursing home.

The Tax Court observed that Plotkin had used funds from RHCA's sale of the Rolla nursing home to pay off his personal obligation to American Bank.  In this regard, the Tax Court concluded that the IRS had properly included in Plotkin's Schedule C income for the 1995 year $217,246 that was paid by RHCA to American Bank following the sale of the Rolla nursing home.  The Tax Court noted that Plotkin had not offered any evidence demonstrating how that money had otherwise been used, nor had he offered any evidence indicating that he personally paid off his American Bank loan with other funds.

The Tax Court rejected Plotkin's argument that the funds paid to Autumn

10

Years and Quixoti should not be included in his income because these funds were partnership distributions. The Tax Court explained that Plotkin was neither a partner in Autumn Years nor RHCA. Moreover, as noted above, the Tax Court found that the payments were made as a result of Plotkin's "work in carrying on the business of RHCA and related entities," and that they were not distributions.

The Tax Court entered a decision in the IRS's favor. Plotkin now appeals.

## II.  DISCUSSION

Plotkin argues that the Tax Court erred in upholding the IRS's tax deficiency determinations because the district court in his criminal case found that Autumn Years was a sham, and therefore, the 99-percent limited partnership interest Autumn Years had in RHCA should be imputed to him. Accordingly, the monies Plotkin received from RHCA's payments to the accounts of Autumn Years and Quixoti were not Schedule C income to him, but rather, were distributions made by RHCA to him as a limited partner. Plotkin argues that such partnership distributions are taxable only to the extent they exceeded his basis in his interest in RHCA, and therefore, the IRS erred in treating the distributions as unreported Schedule C personal income.[3]

---

[3]We review the Tax Court's legal conclusions <u>de novo</u> and its factual findings for clear error. <u>Campbell v. Comm'r</u>, 658 F.3d 1255, 1258 (11th Cir. 2011). "[W]hether a taxpayer received income is an ultimate fact and as such is to be treated as a legal rather than a factual

11

## A.    Ample Evidence Concerning Income Attributable to Plotkin

The IRS's determination of a deficiency in tax is presumed correct, and the taxpayer bears the burden of proving by a preponderance of the evidence that the IRS's determination is incorrect.  Blohm v. Comm'r., 994 F.2d 1542, 1548-49 (11th Cir. 1993).  However, in cases involving the receipt of income unreported by the taxpayer, "the deficiency determination must be supported by some evidentiary foundation linking the taxpayer to the alleged income-producing activity" before the IRS's determination is presumed correct.  Id. at 1549 (quotation marks omitted).  The IRS's required evidentiary showing in these cases is minimal.  Id. Once the Tax Court has found that this minimal evidentiary threshold has been met, the burden shifts to the taxpayer to prove that it is arbitrary or erroneous.  Id.

Here, the evidence amply supported the Tax Court's findings, including that: (1) Plotkin was actively involved in carrying on the business of RHCA; and (2) Plotkin treated the funds paid into Autumn Years's and Quixoti's accounts as his own, using them, as well as part of the proceeds from RHCA's sale of the Rolla nursing home, to pay personal expenses and indebtedness.  Based on these facts, the IRS carried its "minimal" evidentiary burden to show that these funds were income properly attributable to Plotkin.  Id. at 1548-49.  Accordingly, the

determination."  Blohm v. Comm'r, 994 F.2d 1542, 1548 (11th Cir. 1993).

12

question presented to us is whether the funds, which Plotkin received from RHCA through the conduit of Autumn Years, were (1) partnership distributions to Plotkin as a partner, and thus, taxable only to the extent that they exceeded any basis Plotkin had in RHCA; or (2) compensation for his work, taxable as unreported Schedule C income.

## B.    Income Was Not Distribution to Plotkin as a Partner

A partner's distributive share of income, gain, loss, deduction, or credit is determined by the partnership agreement.  I.R.C. § 704(a).  Generally, a distribution of money or property to a partner by a partnership does not cause that partner to recognize a taxable income or gain.  Id. § 731(a).  Rather, the partner recognizes a taxable gain only to the extent that the amount he receives exceeds his adjusted basis in the partnership property.  Id. § 731(a)(1).

"[W]hile a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice . . . and may not enjoy the benefit of some other route he might have chosen to follow but did not."  Bradley v. United States, 730 F.2d 718, 720 (11th Cir. 1984) (quoting Comm'r v. Nat'l Alfalfa Dehydrating and Milling Corp., 417 U.S. 134, 147, 94 S. Ct. 2129, 2136 (1974)) (omission in original).  In addition, "as a general rule, the [IRS] may bind a taxpayer to the form in which the taxpayer has

13

cast a transaction." Id.  As the Supreme Court has noted, the IRS "may look at actualities and upon determination that the form employed for doing business or carrying out the challenged tax event is unreal or a sham may sustain or disregard the effect of the fiction as best serves the purposes of the tax statute.  To hold otherwise would permit the schemes of taxpayers to supersede legislation in the determination of the time and manner of taxation." Higgins v. Smith, 308 U.S. 473, 477-78, 60 S. Ct. 355, 358 (1940).  Although either the IRS or the taxpayer may argue that the form a transaction takes does not always determine its effects, a taxpayer who has taken a concrete course of action may not avoid taxation simply by asserting that he did not in fact take that action or intend to take that action. Shepherd v. Comm'r, 283 F.3d 1258, 1261 & n.5 (11th Cir. 2002).

The Tax Court did not clearly err in determining that Plotkin was not a partner of RHCA, and therefore, did not err in concluding that the amounts paid to Autumn Years and Quixoti were Schedule C income rather than partnership distributions.  Plotkin treated the payments made to the accounts of Autumn Years and Quixoti as his own by using those funds to pay personal expenses.  While Autumn Years might have been a "sham" partnership, given that the Autumn Years partners were unaware of their membership and no partnership formalities were observed, Plotkin cites no authority for his claim that he should be

14

considered the owner of Autumn Years' 99-percent limited partnership interest in RHCA. Plotkin could have made himself a partner of RHCA, but instead assigned that partnership interest to Autumn Years, a partnership that he organized. He then assigned the partnership interests in Autumn Years to his children, Faenger, his ex-wife, KSFS, Medigroup Care Centers Inc., and Management and Development Associates, Inc. Accordingly, he must now accept the tax consequences of his affirmative choice of organization, which assigned him no partnership interest in RHCA or Autumn Years. See Shepherd, 283 F.3d at 1261 & n.5; Bradley, 730 F.2d at 720.

Furthermore, even if Plotkin owned a 99-percent limited partnership interest in RHCA—because Autumn Years's 99-percent limited partnership interest in RHCA was imputed to him by virtue of Autumn Years being a sham—he has not shown that the payments made by RHCA were distributions or other "partnership items," such that the Tax Court erred in finding that the payments were taxable Schedule C income. Even if Plotkin were considered to be a limited partner in RHCA, the Tax Code does not automatically treat all of the funds he received from the partnership as distributions. Instead, the Code specifically indicates that, where a partner performs services for a partnership "other than in his capacity as a member of such partnership," those services are treated as though they were

15

rendered by a non-partner. I.R.C. § 707(a). In addition, a partner's distributive share is determined by the partnership agreement. Id. § 704(a). Therefore, in order to demonstrate that the IRS's conclusion that the payments were compensation was arbitrary or erroneous, Plotkin must affirmatively show that the payments were distributions made pursuant to a partnership agreement. See Blohm, 994 F.2d at 1549.

Plotkin does not allege that his work in carrying out RHCA's business was performed pursuant to any RHCA partnership agreement or in his capacity as a limited partner in RHCA. Instead, as the Tax Court found, the payments made by RHCA to Plotkin were compensation (i.e., akin to a salary) for his work in carrying on the business of RHCA and related entities. Plotkin negotiated a lease agreement with Faenger and Professional TLC, instructed Lavender with regard to the lease payments made to RHCA from Professional TLC, and steered funds from RHCA to American Bank, thereby exercising a "significant amount" of control over RHCA. Moreover, Plotkin neither alleges nor proves that the payments made from RHCA to Autumn Years and Quixoti were made in accordance with RHCA's partnership agreement. Therefore, he has not shown that the payments were partnership distributions, such that the IRS's determination that they were compensation was arbitrary or erroneous. See I.R.C. § 704(a) ("A partner's

16

distributive share . . . [is] determined by the partnership agreement."); Blohm, 994 F.2d at 1549.

Accordingly, the Tax Court did not clearly err in upholding the IRS's determination that the payments Plotkin received from RHCA were taxable as Schedule C income. See Lucas v. Earl, 281 U.S. 111, 114-15, 50 S. Ct. 241, 241 (1930) (holding that income is taxable to the taxpayer who earns it, and the tax cannot "be escaped by anticipatory arrangements and contracts however skillfully devised to prevent the salary when paid from vesting even for a second in the man who earned it").[4]

In light of the foregoing, and upon our review of the record and consideration of the parties' briefs, we affirm the order of the Tax Court as to Plotkin's tax deficiencies for the years 1991 through 1995.

**AFFIRMED.**

---

[4]On appeal, Plotkin for the first time argues that the Tax Court lacked jurisdiction to rule on whether he, as an alleged partner in RHCA, individually owed tax deficiencies because partnership-level proceedings as to RHCA must be initiated and completed first before the IRS can proceed against an individual partner for tax liabilities that stem from partnership items. Plotkin relies on the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"), Pub. L. No. 97-248, 96 Stat. 324 (codified as amended in scattered sections of Title 26, U.S.C.), which contains certain procedures regarding administrative proceedings first against the partnership and then against individual partners regarding "partnership items" as defined in the Tax Code. We reject Plotkin's TEFRA-based jurisdiction argument because, among other reasons, the Tax Court found that Plotkin was not a partner in either Autumn Years or RHCA, and therefore, TEFRA is not even applicable here to the income in the notice of deficiency for which Plotkin has personal liability.